566 A.2d 767

**Joan ROHRBECK**

v.

**John ROHRBECK.**

**No. 56, Sept. Term, 1989.**

Court of Appeals of Maryland.

Dec. 6, 1989.

Bryan Renehan (Cynthia Callahan, Ellen L. Lee, Brodsky, Greenblatt & Renehan, Chartered, all on brief) Gaithersburg, for appellant.

Allen J. Kruger (Alan S. Town, both on brief) Laurel, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS, JJ., and ALAN M. WILNER, (Associate Judge of the Court of Special Appeals of Maryland, Specially Assigned).

ALAN M. WILNER, Judge, Specially Assigned.

This case turns on whether the Circuit Court for Montgomery County entered a judgment—a final, appealable judgment—on July 13, 1988. It has a broader import than that, however, and requires an examination of the nature and function of a device unknown to our courts before 1985—the Qualified Domestic Relations Order (QDRO). The precise issue before us, and the answer to it, will become more clear if we begin with a discussion of this recent addition to our jurisprudence.

## I. *The QDRO*

In 1974, Congress passed ERISA—the Employee Retirement Income Security Act of 1974 (P.L. 93–406, 88 Stat. 829)—in order to provide better protection for beneficiaries of employee pension and welfare benefit plans abounding in the private workplace. ERISA imposed a number of requirements on these plans relating to reporting and disclosure, vesting, funding, discontinuance, and payment of benefits. These requirements were imposed through amendments to both the Federal labor code (Title 29 U.S.C.) and the Internal Revenue Code (Title 26 U.S.C.). Some of the new statutory language was added to only one or the other of those codes; some was added to both codes to ensure that employers would not receive the tax benefits accorded by "qualified" plans unless those plans met the requirements imposed principally as a matter of Federal labor policy.

One of the provisions added to *both* codes was an anti-alienation requirement—a "spendthrift" provision precluding plan participants from assigning or alienating their

benefits under *pension* plans subject to the Act. ERISA § 206(d)(1) added § 1056(d)(1) to Title 29 U.S.C., requiring that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." ERISA § 1021(c) added a similar provision to the Internal Revenue Code. To the definition of "qualified trusts," it added the requirement that "[a] trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated." 26 U.S.C. § 401(a)(13).[1]

ERISA § 514, which became part of the labor code (29 U.S.C. § 1144), and to which no counterpart was added to the Internal Revenue Code, provided, with exceptions not relevant here, that the basic requirements of ERISA (including the anti-alienation requirement) "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan [subject to the ERISA requirements]." The term "State law," for purposes of § 514, includes "all laws, *decisions,* rules, regulations, or other State action having the effect of law, of any State." ERISA § 514(c)(1); 29 U.S.C. § 1144(c)(1) (emphasis added). The preemption provision of ERISA has been regarded by the Supreme Court as "deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.' " *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (quoting in part from *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)). *See also Shaw v.*

---

1. In both instances, ERISA allowed a limited exception to this provision, permitting employees actually receiving benefits under a plan voluntarily to assign up to 10% of the benefits for purposes other than defraying plan administration costs. *See* 29 U.S.C. § 1056(d)(2); 26 U.S.C. § 401(a)(13). The anti-alienation provisions, as noted, apply to pension plans in particular; there is no similar provision applicable to other kinds of employee benefit plans subject to ERISA. *See Mackey v. Lanier Collections Agency & Service,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988).

*Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

The combination of the anti-alienation provision in both codes and the preemption provision of ERISA § 514 eventually raised a question, apparently not anticipated by Congress, as to the validity of orders entered in State domestic relations proceedings requiring that pension benefits be paid to a person other than the plan beneficiary. The question arose in two principal contexts—attachments served on plan administrators designed to enforce previously entered orders for child or spousal support, and orders entered pursuant to State community property or equitable distribution laws actually transferring pension rights.

Although the courts and the Internal Revenue Service apparently had little problem in giving effect to the first kind of order, there was more uncertainty about the second. While considering what eventually became the Retirement Equity Act of 1984 (P.L. 98–397, 98 Stat. 1433, hereinafter referred to as REA), however, Congress decided to clarify both aspects. The Congressional concern was clearly reflected in the various House and Senate Committee Reports on the REA. The House Ways and Means Committee Report noted the uncertainty caused by the anti-alienation and preemption provisions and stated, at 18:

"Your committee believes that the spendthrift rules should be clarified by creating a limited exception that permits benefits under a qualified plan to be divided under certain circumstances. In order to provide rational rules for plan administrators, your committee believes it is necessary to establish guidelines for determining whether the exception to the spendthrift rules applies. In addition, your committee believes that conforming changes to the ERISA preemption provision are necessary to ensure that only those orders that are excepted from the spendthrift provisions are not preempted by ERISA."

The device created to achieve these ends is the QDRO. As further explained in both the House Ways and Means and Senate Finance Committee Reports:

"The bill clarifies the spendthrift provisions of the Internal Revenue Code by providing new rules for the treatment of certain domestic relations orders. The bill creates an exception to the ERISA preemption provision with respect to these orders. The bill provides procedures to be followed by a plan administrator and an alternate payee (a child, spouse, or former spouse of a participant) with respect to domestic relations orders.

Under the bill, if a domestic relations order requires the distribution of all or a part of a participant's benefits under a qualified plan to an alternate payee, then the creation, recognition, or assignment of the alternate payee's right to the benefits is not considered an assignment or alienation of benefits under the plan *if and only if* the order is a qualified domestic relations order. Because rights created, recognized, or assigned by a qualified domestic relations order, and benefit payments pursuant to such an order, are specifically permitted under the bill, State law providing for these rights and payments under a qualified domestic relations order will continue to be exempt from Federal preemption under ERISA."

H.Rep. No. 655 at 18; S.Rep. No. 575 at 19, U.S.Code Cong. & Admin.News 1984, pp. 2547, 2565 (emphasis added).[2]

---

**2.** The House Education and Labor Committee Report reflects the same purpose, though naturally it was directed more toward the labor code amendments. At 39, the Committee stated:

"The Committee believes that ERISA should not preempt state domestic relations law to the extent that 'qualified domestic relations orders' are issued under such State law.

The bill therefore makes clear that neither the anti-attachment provisions found in section 206 of ERISA and section 40(a) of the Internal Revenue Code of 1954, nor the preemption provisions found in section 514 of ERISA apply to qualified domestic relations orders. It is the Committee's intent to remove the confusion that now exists in this area. While ERISA should not be a barrier to recovery of alimony, child support and property settlements, the bill

Because the anti-alienation requirement was part of both the labor and the tax codes, Congress amended both codes to provide for this limited exception. *See* REA § 104 (amending 29 U.S.C. § 1056(d)); REA § 204 (amending 26 U.S.C. §§ 401, 414). Both provisions begin with the statement that the anti-alienation requirement *"shall apply* to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, *except that [it] shall not apply if the order is determined to be a qualified domestic relations order."* (Emphasis added.)

The law then defines a "qualified domestic relations order" as a domestic relations order that meets certain requirements set forth in the statute. It must first be a "domestic relations order," i.e.,

"any judgment, decree, or order (including approval of a property settlement agreement) which—

'(i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, child, or other dependent of a participant, and

'(ii) is made pursuant to a State domestic relations law (including a community property law)....'"

REA §§ 104, 204; 29 U.S.C. § 1056(d)(3)(B)(ii); 26 U.S.C. § 414(p)(1)(B). It must then meet three other requirements:

(1) It must create or recognize the existence of an alternate payee's right to, or assign to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, 29 U.S.C. § 1056(d)(3)(B)(i); 26 U.S.C. § 414(p)(1)(A);

(2) It must clearly specify:

---

makes clear that the orders have to meet specific requirements if they are to be honored by the plan. This will minimize the burden on the plan and eliminate confusion over what the court is ordering.

While the order must meet specific requirements in order to be qualified, the general policy underlying the bill's provisions is that the domestic relations court is the appropriate forum to balance the equities between the parties and settle all controversies."

"(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies."

29 U.S.C. § 1056(d)(3)(C); 26 U.S.C. § 414(p)(2); and

(3) It:

"(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order."

29 U.S.C. § 1056(d)(3)(D); 26 U.S.C. § 414(p)(3).

The law requires each plan to establish "reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders." 29 U.S.C. § 1056(d)(3)(G)(ii); 26 U.S.C. § 414(p)(6)(B). Upon receipt of a domestic relations order, the plan administrator must notify the participant and the alternate payee of the receipt of the order and the plan's procedures for determining its qualified status. The administrator has "a reasonable period" of up to 18 months in which to determine that status and inform the parties of the decision. *See* 29 U.S.C. § 1056(d)(3)(G)–(H); 26 U.S.C. § 414(p)(6)–(7).

As is evident from this discussion, the QDRO has become an order of high significance in State domestic relations practice. An attempt to cause pension plan benefits pay-

able to one party to be paid to an alternate payee, whether through an attachment in aid of a support obligation or pursuant to the Marital Property Disposition Act (Md. Fam.Law Code Ann. § 8–205) can succeed only through the mechanism of a QDRO. See *Fox Valley & Vicinity Const. Workers v. Brown,* 879 F.2d 249, 252 (7th Cir.1989): "[E]RISA preempts any attempt to alienate or assign benefits by a domestic relations order if that order is not a QDRO." *See also Cummings by Techmeier v. Briggs & Stratton,* 797 F.2d 383 (7th Cir.1986). Absent such a qualified order, not only will the pension plan administrator refuse to implement the court's decision, but, given the anti-alienation provisions extant in both the labor and tax codes, coupled with the preemption provision of ERISA § 514 (29 U.S.C. § 1144), there is at least a reasonable argument that a non-qualified order may be invalid even as between the parties.[3]

## II. *This Case*

John and Joan Rohrbeck were married in 1972. They have one child, Douglas, who is now 14 years old. Mr. Rohrbeck has been employed for a number of years as an executive of the National Broadcasting Company, Inc. Through his employment, he participates in three employee-benefit plans—the RCA Retirement Plan, the RCA Income Savings Plan, and a deferred compensation plan. The parties seem to agree that the Retirement Plan is a qualified pension plan subject to ERISA and that any effort to provide an alternate payee with respect to that Plan would require a QDRO. They agree also that at least one of the other two plans is subject to ERISA, although they disagree as to which one. Mrs. Rohrbeck claims that the Income Savings Plan is subject to ERISA and that the deferred compensation plan is not; at oral argument before us, Mr. Rohrbeck asserted the contrary.

---

**3.** We need not and do not decide that issue in this appeal.

After a long and bitterly disputed course of litigation, the Circuit Court for Montgomery County, through Judge Weinstein, entered a Judgment of Absolute Divorce on June 13, 1988. That order granted Mrs. Rohrbeck the divorce grounded upon Mr. Rohrbeck's adultery, awarded custody of Douglas to Mrs. Rohrbeck, and reserved for future determination by the court Mr. Rohrbeck's visitation privileges and "all other issues that have been heretofore framed by the pleadings," including a determination of the marital property pursuant to Md.Fam.Law Code Ann. § 8-203.

Those remaining issues were tried before Judge Bell, sitting by special designation, on July 11, 12, and 13, 1988. At the conclusion of that hearing, Judge Bell announced her decisions from the bench, informing the clerk, near the outset of her remarks:

"The Clerk would—Madam Clerk, I am going to try and tell you to enter judgment when I get to these because *this is going to be the final judgment in this case with the one exception, and that is to the extent there are quadros [QDRO's], I would like to have the order that you both have agreed to on my desk on Monday so that I can sign the order on the quadros.*

All right. I will try to clue you, Madam Clerk, when you need to enter a judgment."

(Emphasis added.)

Judge Bell began by instructing the clerk to enter "a judgment for custody of the son to the wife with the visitation that was specified as part of the hearing." She then proceeded to direct that Mr. Rohrbeck provide health insurance for Douglas and that the parties cooperate in fixing up the marital home so that it could be sold. She declared which of the personal property was marital property and which of it was not, and, in that regard dealt specifically with the items "that are going to be subject to a quadro...." She valued Mr. Rohrbeck's Income Savings Plan at $81,084; "the pension plan, $210,000, subject to a quadro; deferred compensation, $256,889, subject to a qua-

dro, and I will specify what they would be afterwards." [4]
Judge Bell then continued with her declaration and valuation of the marital property, arriving at an aggregate value of approximately $840,115. After considering what part of that property each party had and certain credits, she announced a monetary award to Mrs. Rohrbeck of $3,993.

Moving then to the question of support, Judge Bell discussed the various statutory factors and eventually decided to award Mrs. Rohrbeck alimony in the amount of $2,600 a month and child support for Douglas in the amount of $2,500 a month. Following that, she directed that Mr. Rohrbeck contribute $25,000 toward Mrs. Rohrbeck's counsel fees, to be paid from his share of the proceeds from the sale of the marital home.

In the midst of some further discussion concerning funds or accounts belonging to Douglas, counsel for Mrs. Rohrbeck interjected:

"MR. GREENBLATT: Your Honor [said] that you wanted the quadro by Monday. I am unfortunately going to be away this weekend, and I am going to be in trial on Monday, Tuesday and Wednesday of next week. Would it be at all possible if we could submit the quadro, not the judgment—the judgment I will get to work on right away—but the quadro until the end of next week?

MR. KRUGER: Certainly. I have no problem with that.

THE COURT: Fine."

Realizing that she had not yet announced what, if any, portion of the three plans should be awarded to Mrs. Rohrbeck, Judge Bell then declared that Mrs. Rohrbeck would be entitled to (1) one-half of the $81,084 income savings plan, (2) "one-half of [the] pension times the

4. As we indicated, the anti-alienation provisions have been held to apply only to *pension* plans subject to ERISA. Whether a QDRO is necessary for the Income Savings Plan or the deferred compensation plan is not entirely clear. The point has not been adequately briefed and argued, and we express no opinion on it.

[B]angs' formula," [5] and (3) "a [B]angs' formula times three-fourths of the deferred comp[ensation]." After a bit of clarifying discussion not relevant here, the hearing was concluded.

The docket entry for the day made by the clerk said: "JUDGMENT ENTERED AS TO CUSTODY, HEALTH INSURANCE, MARITAL AND PERSONAL PROPERTY, SAVINGS ACCOUNTS, ALIMONY, CHILD SUPPORT, MONETARY AWARD, PENSION PLANS AND ATTORNEYS FEES. ORDER TO BE SUBMITTED."

No written order reflecting or delineating Judge Bell's oral pronouncements was ever presented to or signed by the court, and no further, more explicit docket entries regarding these matters appear.

On August 26, 1988, counsel for Mrs. Rohrbeck submitted three proposed QDRO's to Judge Bell. On September 2, 1988, Judge Bell declined to sign the orders. In a brief Opinion and Order, she explained:

"Final Judgment was entered herein on July 13, 1988 at the direction of the Court under Rule 2–601a in accordance with the oral opinion of the Court subject only to the stipulation by the Court that a qualified domestic relations Order to be presented by July 18, 1988 would be signed to permit the parties the benefit of such an Order.

---

**5.** We take this cryptic reference to "the [B]angs' formula" to be a reference to *Bangs v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984). In that case, the Court of Special Appeals affirmed a trial court order awarding the wife a percentage share of the husband's pension benefits, if, as, and when received, according to the following formula:

$$\text{Percentage Share } (\tfrac{1}{2}) \times \frac{\text{Duration of the Marriage (in years and months)}}{\text{Total Years of Employment Credited Toward Retirement (in years and months)}}$$

At the request of the Plaintiff, the time was extended to July 22, 1988.

It appearing to the Court that because the proposed Order was not submitted to counsel for the Defendant for approval, nor to the Court until over 30 days after the entry of the Judgment, the Chancellor concludes that under Rule 2–601 she no longer has jurisdiction. Hence, the proposed Orders submitted by letter of August 26, 1988 be and the same hereby are denied on the jurisdictional basis."

On September 12, 1988, Mrs. Rohrbeck filed a motion pursuant to Md.Rule 2–534, asking the court to "[a]lter or [a]mend its September 2, 1988 order, and enter the previously submitted Orders on the ground that the Court still has jurisdiction to do so." She attributed the delay in submitting the proposed QDRO's to a disagreement between counsel, apparently as to the content of the orders, but urged that, in any event, no final judgment had been entered on July 13.

On January 18, 1989, Judge Bell denied the motion "as untimely filed in accordance with opinion and order of September 2, 1988." Mrs. Rohrbeck then noted her appeal. We assumed jurisdiction of the appeal prior to any proceedings in the Court of Special Appeals, through a writ of certiorari granted *nostra sponte.*

### III. *Discussion*

As we said at the outset, the case turns on whether a final judgment was, in fact, entered on July 13, 1988. From that flows the threshold question of whether Mrs. Rohrbeck's appeal was timely filed as well as the correctness of Judge Bell's conclusion that, as of August 26, 1988, the court had no further jurisdiction in the matter.

We believe that Judge Bell erred in her determination that a final judgment had been entered on July 13. The final, appealable judgment in this case was entered on September 2, 1988, when the court refused to consider the proposed QDRO's. It follows, then, that the court *did* have

jurisdiction to consider the proposed orders and that Mrs. Rohrbeck's appeal, noted within 30 days after the court's denial of her motion under Md. Rule 2–534, was timely.

■ If a ruling of the court is to constitute a final judgment, it must have at least three attributes: (1) it must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court properly acts pursuant to Md. Rule 2–602(b), it must adjudicate or complete the adjudication of all claims against all parties, and (3) the clerk must make a proper record of it in accordance with Md. Rule 2–601. The rulings announced and recorded on July 13 possessed none of these attributes.

## A.  Unqualified Final Disposition

■ With exceptions not relevant here, a ruling of a circuit court is not appealable unless it constitutes a final judgment. To have the attribute of finality, the ruling must be so final as either to determine *and conclude* the rights involved or to deny the appellant the means of further prosecuting or defending his or her rights and interests in the subject matter of the proceeding. *In re Buckler Trusts,* 144 Md. 424, 125 A. 177 (1924); *Cant v. Bartlett,* 292 Md. 611, 440 A.2d 388 (1982); *Sigma Repro. Health Cen. v. State,* 297 Md. 660, 467 A.2d 483 (1983).

■ To be final and conclusive in that sense, the ruling must necessarily be unqualified and complete, except as to something that would be regarded as collateral to the proceeding. It must leave nothing more to be done in order to effectuate the court's disposition of the matter. In the first instance, that becomes a question of the court's intention: did the court intend its ruling to be the final, conclusive, ultimate disposition of the matter?

On several occasions recently, this Court, in considering whether a particular order or ruling constituted an appealable judgment, looked to whether the order or ruling was "unqualified," whether there was "any contemplation that a further order [was to] be issued or that anything more [was

to] be done." *Walbert v. Walbert,* 310 Md. 657, 661, 531 A.2d 291, 293 (1987); *Doehring v. Wagner,* 311 Md. 272, 275, 533 A.2d 1300, 1301–02 (1987); *cf. Makovi v. Sherwin–Williams Co.,* 311 Md. 278, 281, 533 A.2d 1303, 1305 (1987). In a footnote in *Doehring,* 311 Md. at 277 n. 2, 533 A.2d at 1303 n. 2, we noted that if the judge "did not intend that his ruling ... finally terminate the litigation ...," it would not constitute a final judgment. Cited for that proposition was *Dawson's Charter Serv. v. Chin,* 68 Md.App. 433, 511 A.2d 1138 (1986), where the Court of Special Appeals, speaking through Judge Adkins, held expressly that a direction by the court that an order is to be submitted constituted "a direction to the clerk not to enter judgment until the order had been signed and filed." *Id.* at 438, 511 A.2d at 1141.

■ Lest there be any lingering question about the matter, we now make clear that, whenever the court, whether in a written opinion or in remarks from the bench, indicates that a written order embodying the decision is to follow, a final judgment does not arise prior to the signing and filing of the anticipated order unless (1) the court subsequently decides not to require the order and directs the entry of judgment in some other appropriate manner or (2) the order is intended to be collateral to the judgment.

■ Because of the different circumstances in which a QDRO may prove necessary, it is not essential that such an order be part of the judgment in the action. For one thing, the Federal law does not require that a QDRO be part of the actual judgment in the case. It defines a domestic relations order as including "any judgment ... or order ..." that meets the other requirements for such an order. Plan administrators are presumably not interested in receiving multi-faceted divorce decrees specifying such matters as custody, visitation, support, and the like. Their only interest is in those matters set forth in 29 U.S.C. § 1056(d)(3) and 26 U.S.C. § 414(p), *supra.*

From the point of view of State law, where a QDRO is needed to enforce an earlier entered support order, it obvi-

ously cannot be part of the underlying judgment. Even when the QDRO is required to effectuate a disposition under Md.Fam.Law Code Ann. § 8–205, there may be circumstances where the need for the order may not be apparent at the time the judgment is entered or where an order entered as part of a judgment has to be modified later because some deficiency in it precludes it from being accepted as a QDRO. We therefore expressly recognize the ability of a party otherwise entitled to a QDRO to obtain one as an aid to enforcing a previously entered judgment.

■ In this case, however, the QDRO's were *not* intended to be collateral to the judgment or simply as aids to enforcing it. Throughout her remarks, Judge Bell made clear that the "judgment" she was purporting to enter would not be final and complete until the individual QDRO's were signed. In that regard, the docket entry made by the clerk, "ORDER TO BE SUBMITTED," is entirely consistent with what the judge envisioned. In this circumstance, then, the general rule we have announced is applicable and the rulings of July 13 did not constitute a final judgment because they were not intended to be final and conclusive.[6] The failure of counsel to submit the proposed QDRO's within the time prescribed by Judge Bell, or even within 30 days of her oral rulings, does not alter that fact. The final, effective determination by the court did not come until September 2, when the court, on jurisdictional grounds, declined even to consider the proposed orders. That was the one and final act which, if not actually concluding the

---

6. The lack of finality and conclusiveness, though clear in a formal sense from the record itself, became apparent in a more substantive way at oral argument before this Court. The QDRO's submitted to Judge Bell on August 26 were not merely perfunctory in nature. There was a substantial disagreement between counsel over their content—the extent to which, for example, Mrs. Rohrbeck was entitled to survivor's benefits under the Retirement Plan. Judge Bell's decision from the bench did not address that issue or apparently other issues that needed to be resolved in order to have a clear QDRO that would both accurately reflect the court's judgment and qualify under ERISA.

rights of the parties, at least denied Mrs. Rohrbeck the means of further prosecuting her rights in the circuit court.

### B.  Resolution Of All Claims

The insufficiency of the July 13 rulings centered, of course, on the court's direction that specific QDRO's be prepared and submitted.  Those QDRO's were thought by the court to be necessary in order to resolve effectively the claim made by Mrs. Rohrbeck with respect to Mr. Rohrbeck's employee benefit plans.  The court understood—correctly as to at least the pension plan—that its award of a share of those plans could not be made effective without the QDRO's.  Until those orders were signed, therefore, a claim in the action remained unresolved.

Aside from the problem of qualitative finality discussed in Part A, that lack of full resolution also implicates Md. Rule 2–602.  Subsection (a) of that Rule provides, in pertinent part, that

> "an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action . . .:
>
> (1) is not a final judgment;
>
> (2) does not terminate the action as to any of the claims . . .;  and
>
> (3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties."

As we have indicated, the issue of the QDRO's—the last unresolved claim in the action—was finally adjudicated on September 2, 1988.  Until then, under Rule 2–602, all prior rulings remained interlocutory and subject to revision; none of them, including the very division of the employee benefit plans announced by the court on July 13, amounted to a final judgment.

### C.  Entry Of The Judgment

Prior to the merger of law and equity procedure in 1984, there was a quite different method for entering judgments

in the two kinds of cases. In a "law" case, the decision of a jury was entered as the jury's verdict, and the decision of the court, sitting without a jury, was entered as a judgment *nisi*. Neither constituted a final, appealable judgment but served only to mark the commencement of a three-day period in which the loser could file a motion for new trial. If no such motion was filed, the *clerk* "enter[ed] a final judgment as of course." See former Md. Rules 567f and 564; also *Lucke v. Commissioner*, 245 Md. 706, 228 A.2d 313 (1967). The time for appeal did not begin to run until the clerk entered that judgment, which could be, and often was, in the form of a brief docket entry. *See Brown v. State*, 237 Md. 492, 207 A.2d 103 (1965); *Merlands Club v. Messall*, 238 Md. 359, 208 A.2d 687 (1965).

In an equity case, there was no such thing as a verdict or judgment *nisi*. The judgment was entered by means of a written decree signed by the judge. *See Hudson Bldg. Supply Co. v. Stulman*, 258 Md. 304, 265 A.2d 925 (1970). The *decree*, this Court said in *Hudson* at 307, 265 A.2d at 926, quoting from Miller, *Equity Procedure* § 260 (1897), "is the fiat or sentence of the law, determining the matter of controversy."

This dichotomy was ended with the 1984 revision of the Maryland Rules. The concepts of judgments *nisi* and absolute were discarded, as was the absolute requirement of a written decree in equity cases. But in adopting Md. Rule 2–601, dealing with the entry of judgments, this Court continued to recognize that not all judgments could be handled the same way. General verdicts of a jury or analogous decisions of a court either denying all relief or allowing the recovery only of costs or of a specified sum of money are ordinarily easy for a clerk to record, and so we provided in Rule 2–601(a) that, upon the announcement of those kinds of verdicts or decisions, "the clerk shall forthwith enter the judgment, unless the court orders otherwise."

With the more complex kinds of decisions, however—special verdicts by a jury or court decisions granting other

kinds of relief—more caution is required. The clerk does not "forthwith enter the judgment" but is required to enter the judgment "as directed by the court." *Id.* The clerk does this "by making a record of [the judgment] in writing" in the file or in a docket book. Rule 2–601(b). The court's decision, or the jury's verdict, does not become a judgment until the clerk makes that entry; the date the clerk makes the record "shall be the date of the judgment." *Id.*

The docket entry of July 13, 1988, does not reflect the recording of a judgment "as directed by the court." It confirms that decisions were made as to the listed matters, but it gives no clue as to what those decisions were. Nor, as we have said, was there any other document in the court file that would have supplied that critical information. Although Judge Bell evidently assumed that the clerk would, in some way, summarize and record the substance of the rulings she was announcing, that is not what, in fact, happened.[7] For that reason as well, then, the July 13 rulings did not constitute a judgment.

---

**7.** As we have indicated, Rule 2–601 does not *require* a written order to be signed, even in complex decisions. As this case well illustrates, however, it is certainly the better practice to embody the terms of such decisions in a written order. The extemporaneous recitation of multiple or complex rulings from the bench may be fine for letting the parties and their attorneys know what the court's decision is in the case, but as it is the actual judgment that will govern the conduct, fortunes, and affairs of the parties, the court must be especially careful that the judgment itself is clear, complete, and precise. A written order prepared either by counsel (and whenever possible consented to as to form by opposing counsel) or by the court itself gives the court an opportunity to review the language, discover and correct any inadvertent imprecisions or inconsistencies, and generally assure itself that the judgment accurately reflects its decision. Upon the filing of a written order, the clerk need do no more than note on the docket that the order was filed and that judgment is entered in accordance therewith. The clerk is relieved of the burden of trying to recall and record what the court said, much less, where the extemporaneous remarks are unclear, of trying to figure out what the court meant.

If, for whatever reason, the court decides in such cases to dictate its decision from the bench and allow the clerk to enter the judgment based on the clerk's recollection of what the court said, the court as a

## D. Conclusion

For all of these reasons, we hold that the court *did* have jurisdiction to consider the proposed QDRO's submitted on August 26, and that it erred in deciding otherwise.

The proposed QDRO's submitted to Judge Bell are not in the record before us, and so we cannot tell whether they were appropriate orders to sign. We hold only that the court had jurisdiction to consider them and that, if it was to carry forth its clearly announced intent and make effective its decision with respect to whatever plan or plans require a QDRO, it should have considered them. We shall remand the case for that purpose.

ORDER OF SEPTEMBER 2, 1988 DECLINING TO CONSIDER PROPOSED ORDERS VACATED; CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; APPELLEE TO PAY THE COSTS.

matter of good practice should review the docket entry and assure itself that the entry accurately and adequately reflects the decision.