675 A.2d 551

**Carol T. KLINGENBERG**

v.

**Barry L. KLINGENBERG.**

**No. 87, Sept. Term, 1995.**

Court of Appeals of Maryland.

May 3, 1996.

318

Stuart J. Snyder, Baltimore, for appellant.

Timothy J. Martin, Towson, for appellee.

Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case involves shares of common stock in Whiting–Turner Contracting Company (Whiting–Turner or the Company), purchased by its employee, Barry Klingenberg, pursuant to the Company's stock plan for certain of its key executive employees. The issue is whether the shares of stock qualify as "deferred compensation" under Maryland Code (1984, 1991 Repl.Vol., 1995 Supp.), § 8–205(a) of the Family Law Article, the ownership of which may be subject to transfer when distributing marital assets subsequent to a divorce.[1]

---

1. Unless otherwise stated, all statutory references are to the Family Law Article.

## I

### A

When apportioning marital assets in a divorce action, Maryland courts generally "may not transfer the ownership of personal or real property from 1 party to the other." § 8–202. The sole exception to this rule is found in § 8–205(a), which provides that in dividing marital property, a court "may transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from 1 party to either or both parties, grant a monetary award, or both, as an adjustment of the equities and rights of the parties concerning marital property." In this case, we are asked to determine whether the stock plan at issue here qualifies as a "pension, retirement, profit sharing, or deferred compensation plan" within the contemplation of § 8–205(a), which would permit a court, in its discretion, to transfer all or part of the interest in the stock from one spouse to the other.

### B

Barry and Carolyn Klingenberg were married on August 10, 1968. The couple separated in 1986. Approximately one year later, they reconciled their differences and resumed cohabitation. The couple separated a second time around June 1, 1988, and Mrs. Klingenberg filed for absolute divorce on June 21, 1993. On July 26, 1994, the Circuit Court for Baltimore County (Hennegan, J.) awarded Mrs. Klingenberg a judgment of absolute divorce.

At the time of their reconciliation in 1987, following their first separation, the Klingenbergs signed a "reconciliation agreement" which provided for the disposition of marital property in the event that they should separate a second time. Paragraph 4(b) of the reconciliation agreement provided for the disposition of a broad range of assets:

Within 30 days [of separation] all cash, savings accounts, checking accounts, certificates of deposit, money market funds, investment funds, stock and any and all like assets

are to be divided equally between the parties. The amount and/or value of any and all such liquid assets is to be fixed as of the date of separation of the parties.

In contrast, ¶ 6 of that agreement provided for the disposition of Mr. Klingenberg's pension:

In the event the parties or either of them seek and obtain an absolute divorce, then in that event Husband shall consent to the entry of a Qualified Domestic Relations Order transferring one-half (½) of the marital portion of Husband's pension to Wife. The marital portion of Husband's pension shall be determined by multiplying the pension benefits by a fraction, the numerator of which shall be the total number of years of marriage and the denominator of which shall be the total number of years of Husband's employment accumulated towards the maximum allowable pension benefits.

The reconciliation agreement appears to have been intended to comprehensively divide the couples' liquid assets in the event of a future separation.

Mr. Klingenberg, as an employee of Whiting–Turner, participated in the company's pension plan. At the time of the divorce, Mr. Klingenberg agreed to transfer a share in this pension to Mrs. Klingenberg, as required by ¶ 6 of the reconciliation agreement. In addition to this pension, however, Mr. Klingenberg had acquired several shares of stock in Whiting–Turner under these circumstances: On December 31, 1985, Mr. Klingenberg signed an agreement titled "The Whiting–Turner Contracting Company Stockholders Agreement." Under this agreement, Whiting–Turner authorized the issuance of 100,000 shares of common stock and 1,200,197 shares of preferred stock. The vast majority of the preferred stock, and therefore control of the company, was to remain in the hands of Willard Hackerman, the principal owner of Whiting–Turner. Twenty-seven employees of the company were eligible to purchase specified numbers of shares of the common stock at a price of $640.00 per share. Mr. Klingenberg was eligible to purchase, and did purchase, 15 shares of the common stock; a total investment of $9600.00. In return,

according to the agreement, Mr. Klingenberg received certificates representing his ownership of the stock.

The stockholder's agreement placed restrictions on transfer of the stock. If Mr. Klingenberg were to attempt to sell his stock to a third party, Whiting–Turner could re-purchase the stock from him at the lesser of the stock's current "book" value or the original $640.00 per share investment. It also could purchase the shares at this low value if Mr. Klingenberg's stock were attached or subjected to execution by a creditor, or if Klingenberg declared bankruptcy, or if he attempted to assign the stock for the benefit of a creditor, or "if any portion of his Stock is made subject to a charging order." Finally, Mr. Klingenberg would be required to sell his stock to Whiting–Turner at this lower value if he terminated his employment for any reason other than death, retirement at age 65, or because of a permanent disability.

If Mr. Klingenberg's employment with Whiting–Turner were to end because of his death, retirement, or disability, the agreement requires Whiting–Turner to re-purchase his stock under a more generous valuation. In these circumstances, the stock would be purchased using the *greater* of the stock's "book value" or the original investment. The "book value" of the stock is determined annually by Whiting–Turner's independent accountants, based on a valuation of the company's total value. It would not be required to repurchase the stock if it had insufficient surplus or credit restrictions, or if adverse tax consequences would result. In the event that Whiting–Turner would not repurchase the shares, the other shareholders would be able to purchase them from Mr. Klingenberg or his estate upon the same terms as Whiting–Turner.

On June 30, 1994, during the divorce proceedings, the parties entered an agreement on the record disposing of all marital property except the Whiting–Turner stock. In announcing the terms of the parties' agreement, Mr. Klingenberg's attorney stated that

[w]ith respect to the Shadow stock or the stock of the Whiting–Turner senior employees, this is the one issue that

we cannot resolve as of yet. We will ask the Court to reserve on that particular issue for a ... factual determination of the value of that stock [on] 6/1/88 and we would ask the Court to give us some period of time within the next 60 days ... to produce expert valuation evidence and testimony so that the Court can make a determination of the value.

At that point, Mrs. Klingenberg's attorney argued that Mrs. Klingenberg was entitled to half of the proceeds from the Whiting–Turner stock "if, as, and when" they are distributed to Mr. Klingenberg. The parties agreed that the circuit court would review the reconciliation agreement and if it determined that the Whiting–Turner stock was a pension plan, it could enter an order distributing the proceeds from the stock if, as, and when Mr. Klingenberg sold the stock.

On September 22, 1994, the circuit court held a hearing on the valuation of the Whiting–Turner stock. The two issues addressed at this hearing were how to characterize the stock, and whether the 1987 reconciliation agreement controlled the disposition of the stock. Mrs. Klingenberg's attorney introduced evidence of the value of the Whiting–Turner stock in 1994, arguing that the reconciliation agreement had been modified at the earlier hearing on June 30 with respect to the stock. In response, the court stated that it had no recollection of any such modification and "[i]f that's not specifically stated on the record [of the earlier proceeding], I'm not buying that it does." The court found that the transcript of the previous proceeding "clearly says the opposite" from Mrs. Klingenberg's argument that the reconciliation agreement had been modified with respect to the Whiting–Turner stock. When Mrs. Klingenberg's attorney persisted, the court suggested that it should vacate the prior order and re-litigate the entire property settlement. At this point, the attorney conceded that the court could take the original reconciliation agreement into consideration in resolving the issue of the stock.

Each side presented expert witnesses at the hearing. Mr. Klingenberg's witness testified as to Whiting–Turner's stock plan and said that the stock should be valued at $9600.00, the amount Mr. Klingenberg would receive if he were to attempt

to sell the stock on the date of the hearing. It was also maintained that the stock should be valued as of the date of separation in 1988. Mrs. Klingenberg's expert witness presented testimony as to the value of the stock plan in 1994, and testified as to the similarities and differences between the Whiting–Turner stock and a pension plan. In addition, the witness testified that the stock plan had been recapitalized as of January 1, 1990 and that the original common stock had appreciated to a value of $38,900 per share. The witness testified that after the re-capitalization, Mr. Klingenberg owned 58,350 shares of stock at a value of $10.00 per share.

In making its ruling, the court focused on whether the Whiting–Turner stock was a pension plan, one-half of the shares of which could be transferred to Mrs. Klingenberg under § 8–205(a). The court, however, found that "the burden has not been met to show it's a pension plan or a plan referred to in Family Law 8–205(a), which will allow me to transfer the rights to parties." The court provided a list of reasons as to why the stock was not a pension plan, specifically finding that the stock was not recognized by the federal government as a pension plan and that the stock was actually stock in Whiting–Turner, even though it was highly restrictive.

After finding that the Whiting–Turner stock actually was stock, as opposed to some other financial arrangement, the court applied ¶ 4(b) of the reconciliation agreement to value the stock as of the date of separation in 1988. In valuing the stock, the court found that Whiting–Turner had grown at least 15 percent per year and that Mr. Klingenberg paid $9600 for the stock at the end of 1985. The court applied the 15 percent growth rate from 1985 to 1988, and valued the stock at $14,600. The court entered a monetary judgment in favor of Mrs. Klingenberg for $7300.00, one-half of the value of the stock.

Mrs. Klingenberg appealed to the Court of Special Appeals, asking it to hold that the circuit court's failure to apply § 8–

205(a) was in error. We granted certiorari before the intermediate appellate court considered the appeal.

### C

Before us, Mrs. Klingenberg argues that the Whiting–Turner stock plan is "deferred compensation" within the meaning of that term as used in § 8–205(a). Because the stock is deferred compensation,. she argues, the circuit court had the authority to transfer the stock on an "if, as, and when" basis. Mrs. Klingenberg further maintains that the court only decided to value the stock as specified in the reconciliation agreement because it had determined that it could not transfer a one-half interest in the stock to Mrs. Klingenberg under § 8–205(a). In contrast, Mr. Klingenberg argues that Mrs. Klingenberg failed to explicitly raise the issue of deferred compensation under § 8–205(a) in the court below and that the circuit court was correct in valuing the stock as specified in the reconciliation agreement.

### II

### A

We hold that the Whiting–Turner stock is a deferred compensation plan within the ambit of § 8–205(a) despite the fact that Mrs. Klingenberg failed to specifically argue that point in the trial court. Maryland Rule 8–131 provides that "[o]rdinarily, the appellate court will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court...." We have frequently stated that the primary purpose of Rule 8–131(a) is to ensure fairness for all parties in a case and to promote the orderly administration of law. *State v. Bell,* 334 Md. 178, 189, 638 A.2d 107 (1994); *Brice v. State,* 254 Md. 655, 661, 255 A.2d 28 (1969). Rule 8–131 also provides that this Court may decide an issue not raised below "if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." The record in this case contains extensive testimony as to the nature of the Whiting–Turner stock plan, and the

parties argued the applicability of § 8–205(a) at length without expressly focusing on that part of the statute pertaining to "deferred compensation." In addition, the circuit court did not limit its ruling to pensions, but held that it had no authority under § 8–205(a) *in toto* to transfer the Whiting–Turner stock.

## B

The circuit court based its ruling in part on the fact that an order transferring an interest in the stock to Mrs. Klingenberg would not meet the requirements for a Qualified Domestic Relations Order (QDRO) under federal law. We conclude, however, that the federal requirements for a QDRO do not constrain our determination of whether the Whiting–Turner stock is "deferred compensation" under 8–205(a).

In its present form, § 8–205(a) embodies the Maryland legislature's reaction to changes in federal laws regulating employee benefit programs.[2] In 1974, Congress passed the Employee Retirement Income Security Act (ERISA), P.L. 93–406, 88 Stat. 829 (1974), "in order to provide better protection for beneficiaries of employee pension and welfare benefit plans abounding in the private workplace." *Rohrbeck v. Rohrbeck,* 318 Md. 28, 30, 566 A.2d 767 (1989). One of the changes made to federal law by ERISA was to impose an anti-alienation requirement on federally regulated pensions—"a 'spendthrift' provision precluding plan participants from assigning or alienating their benefits under *pension* plans subject to the Act." *Id.* at 30–31, 566 A.2d 767 (emphasis in original). In addition, § 514 of ERISA provided that the Act's basic requirements would supersede any state laws "insofar as they may now or hereafter relate to any employee benefit plan" subject to ERISA's requirements.

---

**2.** We discussed the relevant history of these federal laws at length in *Rohrbeck v. Rohrbeck,* 318 Md. 28, 30–36, 566 A.2d 767 (1989), and will only briefly summarize them here.

As we stated in *Rohrbeck, supra,* 318 Md. at 32, 566 A.2d 767, "[t]he combination of the anti-alienation provision . . . and the preemption provision of ERISA § 514 eventually raised a question . . . as to the validity of orders entered in State domestic relations proceedings requiring that pension benefits be paid to a person other than the plan beneficiary." Congress acted to clarify this ambiguity by passing the Retirement Equity Act of 1984(REA), P.L. 98–397, 98 Stat. 1433 (1984). Following passage of REA, ERISA's anti-alienation requirement no longer applied to judicial orders that could be classified as a "qualified domestic relations order." *See* REA § 104; REA § 204. In order to qualify as a QDRO, a judicial order must, in addition to other requirements, be "made pursuant to a State domestic relations law." *See* REA § 104; REA § 204; 29 U.S.C. § 1056(d)(3)(B)(ii)(II) (1994); 26 U.S.C. § 414(p)(1)(B)(ii) (1994).

Prior to 1986, § 8–202(a)(3) of the Family Law Article flatly prohibited the courts from transferring ownership of personal or real property in a divorce action. Following passage of ERISA and the REA, therefore, it was possible that no domestic relations order in Maryland ordering the partition of a pension that was marital property would qualify as a QDRO, since the transfer was not pursuant to a State domestic relations law. As a result, it could be argued that such domestic relations orders were invalid because they had been preempted by federal law. *See Rohrbeck, supra,* 318 Md. at 38, 566 A.2d 767. House Bill 1033 was passed in 1986 to address this problem. *See* Bill Analysis of House Bill 1033 (1986); Summary of Senate Judicial Proceedings Committee Report for House Bill 1033 (1986). This bill amended §§ 8–202(a)(3) and 8–205(a) to allow the courts to transfer ownership of an interest in a "pension, retirement, profit sharing, or deferred compensation plan" as a part of a divorce settlement. *See* ch. 765, Laws of Maryland (1986).

Although the circuit court found that an order attempting to give Mrs. Klingenberg an interest in the Whiting–Turner stock would not qualify as a QDRO, the court also

determined that the stock plan was not a pension plan. In addition, the parties agree that the stock plan is not a qualified benefits plan under ERISA or the tax code and is exempt from the funding, participation and vesting requirements imposed by federal law. *See* Michael J. Canan, *Qualified Retirement and Other Employee Benefits Plans* § 1.6(a) (West 1994). For this reason, the federal requirements for QDROs are not here applicable.

As we have previously noted, the anti-alienation provisions in federal law "have been held to apply only to *pension* plans subject to ERISA." *Rohrbeck, supra,* 318 Md. at 38, 566 A.2d 767 (emphasis in original). Since QDROs were created under federal law to provide an exception to those anti-alienation provisions, they are not applicable here and we need not determine whether the Whiting–Turner stock could be transferred under a QDRO.

## C

To ascertain whether the circuit court could have given Mrs. Klingenberg an interest in the stock, we must determine whether it is "deferred compensation" encompassed within the meaning of § 8–205(a). As we have stated on numerous occasions, "the cardinal rule of statutory interpretation is to ascertain and effectuate the legislative intention" and "the language of the statute itself is the primary source of this intent." *Privette v. State,* 320 Md. 738, 744, 580 A.2d 188 (1990). The words used in a statute are to be given "their ordinary and popularly understood meaning, absent a manifest contrary legislative intention," *In re Arnold M.,* 298 Md. 515, 520, 471 A.2d 313 (1984), and "where the language of the statute is free from ambiguity, courts may not disregard the natural import of the words used in order to extend or limit its meaning." *Privette, supra,* 320 Md. at 745, 580 A.2d 188. The question, then, is whether the stock plan is a "deferred compensation plan" within the popularly understood meaning of the word.

Although § 8–205(a) was amended in response to changes in federal law, we find nothing in the legislative history which demonstrates an intent to *limit* a circuit court to only transferring interests which may be transferred subject to a QDRO. Since there appears to be no illuminating legislative history on this issue, we are left with the plain language of the statute.

■ Deferred compensation "generally refers to money which, by prior arrangement, is paid to the employee in tax years subsequent to that in which it is earned." Michael J. Canan, *Qualified Retirement and Other Employee Benefit Plans* § 1.6 (West 1994). Black's Law Dictionary (6th ed.1990) defines "deferred compensation" as "[c]ompensation that will be taxed when received and not when earned," *id.* at 421, and defines "compensation" as "[r]emuneration for services rendered" or "[c]onsideration or price of a privilege purchased." *id.* at 283. *See also Greensboro Pathology Associates v. United States,* 698 F.2d 1196 (Fed.Cir.1982) (stating that "[i]f something is a plan of deferred compensation it should by definition be compensation received in the future for work done in the past.").

While some deferred compensation plans may "simply delay distribution of cash payments to employees," a deferred compensation plan may also accomplish other goals, such as tying receipt of the deferred compensation to continued performance by the employee or including covenants not to compete. Canan, *supra,* § 2.4. The term "deferred compensation plan" is frequently used to refer to special compensation arrangements offered to highly paid executives. *See* Andrew Lawlor & Mark Manin, Nonqualified Deferred Compensation for Key Executives, *in* Employee Benefits Handbook § 13–2 (Fred K. Foulkes ed.1982); *see also* Black's Law Dictionary 421 (defining "nonqualified deferred compensation plans" as "[c]ompensation arrangements which are frequently offered to executives" and noting that "[s]uch plans may include stock options, restricted stock, etc.").

The stock plan at issue here was designed with the intention of retaining key executives by providing a long-term incentive to remain with Whiting–Turner. Mr. Klingenberg was given the opportunity to invest in the stock plan as an incident to his employment with Whiting–Turner, and will receive the highest level of benefits under the stock plan if he remains with the company until retirement. We conclude that the Whiting–Turner stock plan is a "deferred compensation plan" within the "ordinary and popularly understood meaning" of the term. *In re Arnold M., supra*, 298 Md. at 520, 471 A.2d 313.[3]

In view of this conclusion, we shall remand the case for further proceedings. We cannot order the court below to transfer an interest in the Whiting–Turner stock at this time for two reasons. First, § 8–205(a) gives the circuit court the discretion to transfer an interest in a deferred compensation plan, but does not require it to do so. Thus, the circuit court may not have chosen to apply § 8–205(a) even if it had determined that it had such authority. Second, it is quite possible that the stock could be both "deferred compensation" under § 8–205(a) and "stock" as used in the reconciliation agreement. In this event, the circuit court must determine whether to apply the reconciliation agreement and value the stock as of 1988, or to exercise its authority under § 8–205(a).

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.*

---

**3.** At the same time, it is apparent that the plan provides compensation not only for Mr. Klingenberg's past services, but is intended to compensate him for future services by providing him with an incentive to remain with Whiting–Turner until retirement. If, upon remand, the circuit court chooses to order Mr. Klingenberg to distribute a share of the profits from the Whiting–Turner stock on an if, as, and when basis, the circuit court must determine how much of the stock value at the time of retirement is a result of compensation received before the divorce and how much is a result of compensation earned subsequent to the divorce. Mrs. Klingenberg will only be entitled to a one-half share of the compensation earned prior to the divorce.