Wallace L. HOGLE, Appellant,

v.

Shirley A. HOGLE, Appellee.

No. 02A04–9907–CV–332.

Court of Appeals of Indiana.

Aug. 15, 2000.

Douglas Dormire Powers, Frederick B. Jonassen, Baker & Daniels, Richard J. Thonert, Fort Wayne, Indiana, Attorneys for Appellant.

Ward W. Miller, More & Miller, Fort Wayne, Indiana, Attorney for Appellee.

## OPINION

MATTINGLY, Judge

Wallace Hogle appeals the trial court's entry of a Qualified Domestic Relations Order ("QDRO"). He raises a single issue on appeal, which we restate as whether the trial court properly entered, some twenty years after the parties' marriage was dissolved, a QDRO which transfers to Wallace's former wife, Shirley Hogle, benefits from Wallace's pension plan in order to satisfy a California judgment on an alimony arrearage.

We affirm.

## FACTS

Wallace's marriage to Shirley was dissolved by a California court in 1979. That judgment provided that Wallace was to pay Shirley $1000 per month in spousal support. Wallace did not pay, and by 1999 his support arrearage had reached over $375,000.

The California dissolution court reduced the spousal support arrearages to money judgments by writs of execution in 1983 and 1991, and in 1989 and 1991 Shirley sought enforcement of the writs in the Allen County, Indiana Superior Court ("the Indiana court"). In 1992, the Indiana court granted Shirley's motion to register the 1991 California writ of execution as an Indiana judgment in her favor. In 1998, Shirley moved for entry of a QDRO and in 1999, the Indiana court issued an order that satisfied the technical requirements of a QDRO and purported to

> Transfer, by court process, to [Shirley] all of [Wallace's] (1) vested accrued benefits payable under a defined pension benefit plan, and (2) total account balance under a defined contribution benefit plan, both qualified under 26 U.S.C. § 401 and the Employee Retirement Income Security Act of 1974, to the extent necessary to satisfy a California state

domestic relations order and judgment. . . .

(R. at 54–55.)

## DISCUSSION AND DECISION

■ Through the Employee Retirement Income Security Act of 1974 ("ERISA"), Congress established a detailed federal framework for the regulation of pension and welfare benefit plans. *Von Haden v. Supervised Estate of Von Haden,* 699 N.E.2d 301, 303 (Ind.Ct.App.1998). ERISA provides that alienation or assignment of benefits is generally prohibited under a pension plan. 29 U.S.C. § 1056(d)(1). Since these anti-alienation provisions were causing difficulties in domestic relations settings, especially where ERISA-governed pensions had to be divided, the Retirement Equity Act (REA) amendments to ERISA in 1984 created a limited exception for a state domestic relations order if it is a "qualified domestic relations order." 699 N.E.2d at 304.

Wallace argues the Indiana court's order was improper because a QDRO must be a "domestic relations order" made pursuant to a state's domestic relations law, and that neither the California writ of execution nor the related Indiana judgments and orders can be so characterized. We disagree.

A "domestic relations order" is defined in ERISA as follows:

> The term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—
>
> (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
>
> (II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 206(d)(3)(B). Wallace offers three reasons why the purported QDRO is

not a "domestic relations order" even though it "relates to … alimony payments" insofar as it seeks to enforce a writ of execution concerning an arrearage arising out of an alimony obligation established by the Hogles' 1979 divorce decree.

First, Wallace notes that the QDRO could not be related to Indiana domestic relations law because it was issued pursuant to the domestication of a California writ of execution and that no domestic relations matters had been filed in Indiana. Second, he argues the purported QDRO does not arise out of California domestic relations law. He concedes the 1991 California writ of execution that the QDRO is intended to enforce "may arise under California domestic relations law," (Br. of Appellant at 12),[1] but he correctly notes that the writ of execution itself does not meet the technical requirements of a QDRO. Finally, he argues that the various California and Indiana orders cannot be combined to support a QDRO.

■ Wallace first asserts, without citation to ERISA or any decision applying or interpreting it,[2] that "only a court in the

state that granted the divorce may issue a QDRO." (*Id.* at 15.) Next, Wallace asserts "the impossibility of using [the 1991 California writ of execution] as a means of supporting the [QDRO]."[3] (*Id.* at 18.) He appears to argue that the QDRO is improper because the California statute under which the writ of execution was issued itemizes the categories of property subject to levy by such a writ, and pension benefits are not included under that statute. However, any state statute that purported to include ERISA-governed pension benefits as property subject to levy by a writ of execution would presumably be preempted by ERISA itself. To the extent ERISA establishes the QDRO as the sole means of establishing an alternate payee's right to pension benefits, the fact that the writ of execution does not also address such benefits has no legal effect.

■ Finally, Wallace argues, again without explanation or citation to authority, that because the QDRO is intended to *satisfy* a California state domestic relations order it could not have been made *pursuant* to California domestic relations

1. Enforcement of support orders by writ of execution constitutes a proceeding under the California Family Law Act. *In re Marriage of Williams,* 163 Cal.App.3d 753, 209 Cal.Rptr. 827, 829 (1985). That decision noted the pre-REA decisions had "specifically approved of garnishment of ERISA pension plan benefits by writ of execution to satisfy spousal support arrearages," *id.* at 832, and stated the legislative history of the REA "does not condemn former case law permitting distribution of pension benefits to former spouses to satisfy spousal support obligations; rather, it merely recognizes the need for uniform standards." *Id.* at 835.

2. Wallace relies on *Bowles v. Bowles,* 721 N.E.2d 1247 (Ind.Ct.App.1999) to support this premise. In *Bowles,* we reversed a trial court decision that Indiana was an "inconvenient forum" for an action brought under the Uniform Child Custody dissolution law. The record reflects Wallace is a sailor who was born in Indiana, has resided in Indiana for some twenty years, spends his time in Indiana when he is not overseas, and has never challenged the jurisdiction of the Allen Superior Court. As such, the applicability of *Bowles* to

the question of the effect of Shirley's QDRO is not apparent.

Wallace also cites a Maryland ERISA decision for the premise that "the domestic relations court is the appropriate forum to balance the equities between the parties and settle all controversies." *Rohrbeck v. Rohrbeck,* 318 Md. 28, 566 A.2d 767, 770 n. 2 (1989). As the "controversies" between the parties apparently were settled in the California divorce action, it is not apparent how *Rohrbeck* supports Wallace's statement that ERISA does not permit Shirley to "base the disposition of over $300,000 in Wallace's pension assets on a fleeting contact with an Indiana collection action." (Br. of Appellant at 17.)

3. Wallace offers no authority or explanation for his apparent premise that a QDRO must necessarily be "supported" by a separate judgment. We note that a QDRO has been characterized as any order made pursuant to a state domestic relations law which "*creates* or recognizes the existence of an alternative payee's right" to pension benefits. *Ablamis v. Roper,* 937 F.2d 1450, 1454 (9th Cir.1991) (emphasis supplied).

law. Because this argument is not explained or supported it is waived. *Pitman v. Pitman,* 717 N.E.2d 627, 633 (Ind.Ct. App.1999). Notwithstanding the waiver, we note that ERISA does not necessarily require that a QDRO be a part of the actual judgment in a case, *In re Marriage of Bruns,* 535 N.W.2d 157, 162 (Iowa Ct. App.1995), and that a retirement plan may be garnished to satisfy a past-due alimony obligation based on a post-decree QDRO, *id.*

It is well-established that, under certain circumstances, a pension may be attached or garnished as a means of satisfying a support arrearage. Prior to the enactment of the REA, a number of courts had held that garnishment of a pension in order to satisfy a support arrearage was not even an "alienation" to which the ERISA anti-alienation provision applied. Under the reasoning of those decisions, an attachment or garnishment for purposes of satisfying an alimony arrearage would presumably not be subject to the QDRO exception to the anti-alienation rule, because it would not be subject to the rule itself.

In *American Tel. & Tel. Co. v. Merry,* 592 F.2d 118 (2d Cir.1979), for example, the court acknowledged the plain language of the ERISA anti-alienation provision, but still found an implied exception to that provision for orders to garnish pension payments so that family support payments might be made. The court first addressed the broad language of the ERISA pre-emption clause, which included "all laws, decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c)(1). A strict, literal construction of that provision, the court held, would "lead to the unreasonable conclusion that Congress intended to preempt even those state laws that only in the most remote and peripheral manner touch upon pension plans." 592 F.2d at 121. A more reasonable interpretation, it believed, would be "that a garnishment order used to satisfy court ordered family support payments is impliedly excepted from preempted state

law relating 'to any employee benefit plan,' and also from the alienation and assignment proscription." *Id.* (citations omitted).

■ The post-REA decisions indicate that state domestic relations orders concerning pension benefits must now comply with the requirements for QDROs; otherwise, they are pre-empted by ERISA. *E.g., Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080 (7th Cir.1994). *And see Brosamer v. Mark,* 561 N.E.2d 767 (Ind. 1990). There, our supreme court determined that the anti-alienation provision does not protect pension funds from garnishment *after* they are deposited in a pensioner's bank account. The court stated that ERISA is intended to ensure that pension benefits will be *available for distribution* to pensioners, *id.* at 770, but went on to note that:

> There is nothing to indicate that Congress intended to provide pension beneficiaries a shield against the legitimate demands of creditors.... We refuse to stretch ERISA to make Brosamer and other beneficiaries like him judgment proof. Consequently, we hold that 29 U.S.C. § 1056(d)(1) *protects ERISA-qualified pension benefits from garnishment* only until they are received by a beneficiary.

*Id.* at 771 (emphasis supplied). This dicta suggests our supreme court would not follow those pre-REA decisions which held that garnishment of a pension in order to satisfy a support arrearage is not an "alienation" to which the anti-alienation rule, and thus the QDRO exception, would apply.

■ It is also clear from the post-REA decisions that pension funds may in some circumstances be garnished or attached by means of a QDRO in order to satisfy a past-due support obligation. *See, e.g., In re Marriage of Rife,* 529 N.W.2d 280 (Iowa 1995). When the Rife marriage was dissolved in 1982, the wife was awarded alimony in the amount of $500 per month.

The husband made only two payments over the next twelve years. He was held in contempt twice during that period, and all attempts to collect from him were unsuccessful. In 1993 the wife obtained a QDRO that ordered the arrearage of nearly $120,000 be satisfied by means of garnishment of the corpus of the husband's pension plan. In upholding the order, the Iowa Supreme Court noted that ERISA was not intended to be a vehicle for avoidance of family support obligations, *id.* at 282, and stated "we see nothing in the federal statute that prohibits invasion of the corpus." *Id.* at 281.

The Pennsylvania Supreme Court addressed a situation markedly similar to the one before us in *Stinner v. Stinner*, 520 Pa. 374, 554 A.2d 45 (1989). The Stinners were married in 1956 and divorced in 1977. They entered into a property settlement agreement prior to the divorce that provided, among other domestic relations matters, that Mr. Stinner would pay alimony to Mrs. Stinner. The decision does not indicate that the agreement was incorporated in the divorce decree in any manner.

Mr. Stinner honored the agreement for eighteen months, then stopped paying alimony. Mrs. Stinner brought an action in assumpsit for breach of the agreement, and a complaint in equity to enforce it. In 1980, judgment was entered in her favor. Mr. Stinner still did not pay. Six years later, Mrs. Stinner filed two writs of execution to garnish Mr. Stinner's Bethlehem Steel pension that had been established under ERISA. Bethlehem Steel refused to comply on grounds the writ of execution was not a QDRO, and the trial court agreed.

The *Stinner* court reversed the lower court and decided the pension could be attached in order to enforce the alimony agreement. The lower court had decided Mrs. Stinner's right to alimony was based solely on contract and not on the state's domestic relations law. The supreme court agreed that the writ of execution itself was not a QDRO, but found that the 1980 judgment enforcing the alimony agreement was a QDRO based on the decisional domestic relations law of Pennsylvania. *Id.* at 47–48. It was the "custom" in Pennsylvania at that time for couples to avoid divorce contests by entering into support agreements, and the courts had held such alimony agreements valid and enforceable even though there was generally no statutory right to alimony. *Id.* at 48. The 1980 judgment satisfied most of the requirements of a QDRO in that it was related to alimony payments for a former spouse; it was made pursuant to Pennsylvania domestic relations law; it specified the amount of the participant's benefits to be paid and the period to which the order applied; and it named the plan participant and the alternate payee.[4] The order did not include the most recent addresses of the participant and alternate payee, an omission the court found "not a fatal defect." *Id.*

The *Stinner* court, relying on pre-REA case law, noted that the purpose of the ERISA anti-alienation provision is "to protect an employee from his own financial improvidence in dealing with third parties. The provision is not intended to alter traditional support obligations, but rather to assure that the employee and his beneficiaries reap the ultimate benefits due upon retirement." *Id.* at 49.

The *Stinner* decision shows that, at least under some circumstances, the money in a pension fund is available to be attached via a QDRO in order to satisfy an alimony arrearage despite the general ERISA anti-alienation provision.

We acknowledge that some state courts have determined that a QDRO may be improper where, as in the case before us,

4. The dissenting justice in *Stinner* felt the 1980 judgment was not a QDRO because it did not satisfy the requirement that "the order give the spouse a specific interest in the subject pension proceeds." 554 A.2d at 49. But even that justice acknowledged Mrs. Stinner had, "at least arguably, a domestic relation order." *Id.* at 50.

it has the effect of creating an interest in an asset that did not exist at the time of the dissolution or which was disposed of by the dissolution property settlement. In *DeSantis v. DeSantis,* 714 So.2d 637, 638 (Fla.Dist.Ct.App.1998), the court determined a QDRO had been improperly entered where the dissolution judgment had awarded the husband the interest in his pension plan, and awarded the wife the interest in hers. The trial court entered the QDRO to attach assets in the wife's pension plan after the wife failed to make a court-ordered cash payment to the husband. The appellate court reversed: "To order a QDRO on the wife's pension plan is to create an interest in that asset which the final judgment extinguished. That is tantamount to a modification of the final adjudication of property rights in a divorce case, which is not permitted." *Id.*

Similarly, in *Hoy v. Hoy,* 29 Va.App. 115, 510 S.E.2d 253 (1999), a divorce decree had awarded spousal support but awarded no interest in the pension plan from which the wife sought to recover an alimony arrearage. The husband's interest in the pension plan did not exist at the time of the divorce. The appellate court found that a post-divorce order awarding the wife $84,000 from the husband's pension plan was not a QDRO but was instead an improper attempt to reopen and modify the divorce decree. *Id.* at 254. A QDRO, it held, must be consistent with the substantive provisions of the original decree and that statutory exception does not empower trial courts to make substantive modifications in the final divorce decree. *Id.*

Other courts have determined, however, that the attachment by means of a QDRO of a former spouse's pension plan does not amount to an improper modification of the final adjudication of property rights even when there has been an adjudication to the effect that the creditor spouse has no interest in the debtor spouse's pension plan. In *Bruns,* the husband and wife both worked for the same employer while they were married. Each spouse had his or her own pension plan and the divorce decree provided that each retained all the interest to his or her own pension. The couple divorced in 1982, the husband stopped paying alimony in 1988, and in 1992 the wife sought to modify the divorce decree by means of a QDRO. The trial court entered a QDRO directing the pension plan administrator to pay the wife $500 per month to satisfy the alimony obligation, finding the husband's failure to pay alimony to be a substantial enough change in circumstances to permit modification of the divorce decree.

The appellate court decided the wife was not seeking to redistribute property previously awarded in a divorce decree, but instead was seeking to enforce an alimony provision through a garnishment or attachment. 535 N.W.2d at 161. The issuance of the QDRO was thus not an improper modification of the original property award. The assignment of pension benefits was permitted, in part, by the equitable powers of the trial court in dissolution matters; the appellate court noted that the wife was disabled, the husband had not paid his alimony obligation for years, and the wife had been unable to enforce the alimony award through wage assignment or garnishment. *Id.* at 163.

A similar result was reached in *Baird v. Baird,* 843 S.W.2d 388 (Mo.Ct.App.1992), where the trial court had dismissed the wife's application for a QDRO for past due maintenance and child support. The wife sought a lump-sum distribution from the pension plan's current value. The trial court noted that the divorce decree had awarded the husband's retirement account to him, and that the support payments had not been ordered paid from that account. Thus, a QDRO entered some eleven years after the divorce would amount to an unlawful modification of the property division provisions of the divorce decree. *Id.* at 391.

The court of appeals reversed, holding that a QDRO could be used to enforce the

delinquent support judgment. The wife was not seeking to redivide marital property, but to collect a judgment for delinquent support payments; under Missouri law, a spouse could attach or execute against any of a debtor spouse's property to enforce a decree for maintenance or child support. A pension plan, it held, qualifies as "property against which such a judgment may be enforced through execution or garnishment." *Id.* at 392.

█ Since ERISA does not provide an enforcement mechanism for collecting judgments, state law methods for collecting money generally remain undisturbed by ERISA; otherwise there would be no way to enforce a judgment won against an ERISA plan. *Mackey v. Lanier Collection Agency,* 486 U.S. 825, 833–34, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). We find the Hogle QDRO, like those approved in the *Baird* and *Bruns* decisions, to be an appropriate mechanism for enforcement of Shirley's support arrearage judgment, and we affirm the trial court's entry of a QDRO for that purpose.

Affirmed.

BAILEY, J., and BARNES, J., concur