In re the MARRIAGE OF Wendy R. COOK and Guy P. Cook, Jr.

Wendy R. Cook, Appellant–Petitioner,

v.

Bricklayers Local Union 19 of Indiana Retirement Plan, Appellee–Intervenor.

No. 18A05–0711–CV–653.

Court of Appeals of Indiana.

April 14, 2008.

Bruce N. Munson, Muncie, IN, Attorney for Appellant.

Frederick W. Dennerline, Geoffrey S. Lohman, Fillenwarth Dennerline Groth & Towe, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

This case involves the question of *when*—not *if*—a former spouse is entitled to receive benefits from a Qualified Domestic Relations Order (QDRO) that was entered to satisfy a child support arrearage. Appellant-petitioner Wendy R. Cook appeals the trial court's grant of appellee-intervenor Bricklayers Local Union 19 of Indiana Retirement Plan's (Bricklayers) motion to correct error, claiming that the trial court erred in denying her request for pension benefits under her former husband's retirement account pursuant to a QDRO that was entered after the dissolution of the parties' marriage. Specifically, Wendy argues that a public policy exception under the Employee Retirement Income Security Act (ERISA) to the prohibition regarding the alienability of pension benefits requires that a support recipient who receives a QDRO towards the satisfaction of a child support arrearage should receive funds "sooner rather than later." Appellant's Br. p. 2. Concluding that the trial court properly determined that Bricklayers was not obligated to disburse the funds immediately to Wendy from her former husband's pension plan, we affirm.

## FACTS

Wendy and Guy Cook were divorced on August 22, 2005. Guy was employed and participated in a retirement plan (the Plan) through Bricklayers. After Guy amassed a child support arrearage of nearly $25,000, the trial court entered a QDRO on January 20, 2006. The QDRO was entered to satisfy Guy's child support arrearage and property settlement obligation. After objections were made to the initial QDRO, the trial court entered an amended order, which provided in relevant part as follows:

> Nothing herein shall be deemed to require the Plan to provide any type or form of the benefits, or any option, not otherwise provided under the Plan; nor shall any provision of this Order be deemed to require the Plan to provide increased benefits (determined on the basis of actuarial values) over and above the benefits otherwise provided thereunder. . . .

Appellant's App. p. 15.

Upon receiving the QDRO, the Plan set aside benefits for Wendy in accordance with its terms. The QDRO provided that Wendy's account would have earnings and losses like the accounts of other participants under the Plan. Moreover, Wendy could access the benefits at Guy's earliest retirement age or when Guy became eligible for benefits by reason of disability or death. The Plan set forth four classes of benefits: (1) retirement; (2) termination; (3) disability; and (4) death. The earliest age that a participant becomes eligible for retirement benefits under the Plan is fifty-five, assuming that other conditions neces-

sary to qualify for early retirement are satisfied. A termination benefit is availably only if the participant has accumulated less than $5,000 in the account and has accumulated two consecutive one-year breaks in service. The death and disability benefits, as the names suggest, are available only to a participant who has become disabled or has died.

Article VII, Section 4 of the Plan prohibits the assignment or alienation of benefits. Appellant's App. p. 77. With regard to QDROs, Article VII, Section 10 of the Plan states:

> The trustees will make arrangements to comply with orders under state law that are "[QDROs]" that direct benefits to be paid by a third party. However, the Plan is not required to comply with such an order unless it meets the statutory standards for a [QDRO]. Such an order must clearly identify the alternate party and the part of the Participant's benefit to which he or she has a claim. Any claims must be evidenced by a certified copy of the court order. The Trustees shall not be responsible for any retroactive payments.

*Id.* at 78.

On April 3, 2007, Wendy filed a petition to modify the QDRO, requesting an immediate payout of $18,903.20 in partial satisfaction of Guy's child support arrearage. The trial court denied the petition and Wendy filed a motion to correct error on June 21, 2007, claiming that the trial court erred in determining that it lacked the authority to order an immediate release of funds from Guy's retirement account to satisfy his support arrearage because the ruling "is contrary to law and public policy." *Id.* at 20. The trial court granted the motion on June 29, 2007, and the Plan filed its motion to correct error on July 27, 2007. In relevant part, the Plan asserted that

2. The Bricklayers of Indiana Retirement Plan is an employee pension benefit plan as defined under the Employee Retirement Income Security Act (ERISA).

3. The court's granting of Petitioner's Motion to Correct Error is contrary to ERISA law and the Internal Revenue Code.

4. Under ERISA and the Internal Revenue Code, a [QDRO] may not alter the form or amount of the payout. A QDRO cannot "require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." 26 U.S.C. § 414(p)(3); 29 U.S.C. § 1056(d)(3).

5. Under the Bricklayer's Retirement Plan, benefits are not payable until the participant of the plan becomes disabled, dies, or retires with either 30 years of service and attaining 55 years of age, or at age 65. *See* Article II, Section I of the Plan Document which is attached as Exhibit A to the attached affidavit of Becky Lambert.

5. There are no exceptions in the Retirement Plan to permit payment of benefits outside of the eligibility schedule.

7. Indiana courts have held that a QDRO must comply with ERISA law and cannot require the plan administrator to provide any type or form of benefit, or an option, not otherwise provided for under the plan. *Parham v. Parham,* 855 N.E.2d 722, 729 (Ind.Ct.App.2006).

Appellant's App. p. 24. On October 17, 2007, the trial court granted the Plan's motion to correct error, and Wendy now appeals.

## DISCUSSION AND DECISION

We initially observe that a trial court's decision to either grant or deny a motion to correct error is reviewed for an abuse of discretion. *Principal Life Ins. Co. v. Needler*, 816 N.E.2d 499, 502 (Ind. Ct.App.2004). The trial court's decision is "cloaked in a presumption of correctness," and the appellant has the burden of establishing an abuse of discretion. *Petersen v. Burton*, 871 N.E.2d 1025, 1027 (Ind.Ct. App.2007). An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before it, and the inferences that may be drawn therefrom, or if it is contrary to law. *Id.*

In this case, it is undisputed that Guy's employee benefit plan is subject to the provisions of ERISA. 29 U.S.C. §§ 1002(2)–(3). Indeed, ERISA requires pension plans to prohibit the assignment or alienation of benefits, 29 U.S.C. § 1056(d)(1), and the Bricklayers Plan adopted such a provision. Appellant's App. p. 77. In order for a court order relating to the distribution of child support or other marital property to be a QDRO, it must comply with, among other things, 29 U.S.C. sec. 1056(d)(3)(D), which provides as follows:

> A domestic relations order meets the requirements of this subparagraph only if such order—
>
> (i) *does not require a plan to provide any type or form of benefit or any option, not otherwise provided under the plan.*
>
> (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
>
> (iii) does not require the payment of benefits to an alternate payee which are required to be paid to an alternate payee under another order previously deter-

mined to be a qualified domestic relations order.

(Emphasis added). In light of these provisions, it is apparent that an order that requires a plan to provide a type of benefit that does not exist under its terms is not a "qualified" domestic relations order. As noted above, a pension plan that complied with such an order would violate the provisions of 29 U.S.C. § 1056(d). Also, a provision of the Internal Revenue Code, which authorizes the Plan's tax-exempt status, provides that a domestic relations order will be considered "qualified" only if it "does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan[.]" 26 U.S.C. § 414(p)(3)(A).

By way of further illustration, in *Parham v. Parham*, 855 N.E.2d 722, 729–30 (Ind.Ct.App.2006), *trans. denied,* the wife had obtained a QDRO as part of the dissolution proceedings that did not comply with the provisions of 29 U.S.C. § 1056(d)(3)(D), in that it provided a delayed benefit payment that was not authorized under the pension plan. *Id.* at 726. After being notified of the deficiency by the plan administrator, she sought a revised QDRO, to which the husband objected. The trial court granted the revised QDRO, and we affirmed, noting that a "trial court with knowledge of a pension plan's requirements would not order the preparation of a QDRO that does not comply with ERISA." *Id.* at 730.

Here, although Wendy acknowledges the ERISA provisions set forth above, she maintains that public policy considerations with regard to ERISA allow her an immediate claim to the funds under the QDRO. In essence, Wendy asserts that the "Plan's argument subordinates the needs of children to the Plan's governing rules, which at their core are designed to protect pen-

sioners from themselves." Appellant's Br. p. 5.

In support of her claim, Wendy directs us to *M.H. v. J.H.*, 93 Misc.2d 1016, 1022, 403 N.Y.S.2d 411 (1978), where it was observed that "the exemption section of [ERISA], like that of other pension plans is not intended, and is not construed to defeat a spouse's or child's right to support from this source of income." Moreover, Wendy notes that ERISA enactments "were not intended to be a vehicle for avoidance of familial support obligations of [an IRA] settler." *Mallory v. Mallory*, 179 N.J.Super. 556, 432 A.2d 950, 955 (Ch. Div.1981). Finally, Wendy directs us to this court's decision in *Hogle v. Hogle* 732 N.E.2d 1278, 1281 (Ind.Ct.App.2000), which, she argues, should control the outcome here:

> Through ... [ERISA], Congress established a detailed federal framework for the regulation of pension and welfare benefit plans. *Von Haden v. Supervised Estate of Von Haden*, 699 N.E.2d 301, 303 (Ind.Ct.App.1998). ERISA provides that alienation or assignment of benefits is generally prohibited under a pension plan. 29 U.S.C. 1056(d)(1). Since these anti-alienation provisions were causing difficulties in domestic relations settings especially where ERISA-governed pensions had to be divided, the Retirement Equity Act (REA) amendments to ERISA in 1984 created a limited exception for a state domestic relations order if it is a "[QDRO]."

*Id.* at 1279.

In light of the above, Wendy claims that the REA amendments to ERISA entitle her to an immediate distribution of Guy's pension benefits. However, it is apparent to us that the pronouncement in *Hogle* confirms that domestic relations orders must comply with the provisions of ERISA. Indeed, the *Hogle* court determined that the domestic relations order was a QDRO within the meaning of ERISA. Hence, the QDRO was lawful, and the import of *Hogle* was to reject the husband's various arguments as to why the QDRO did not fit within ERISA's statutory definition. *Id.* at 1281–84. We also note that the REA amendments to ERISA discussed in *Hogle* provide specific mechanisms for authorizing the division and distribution of retirement accounts to former spouses. *Id.* at 1279. Had Congress intended to provide for an immediate distribution of funds from a pension plan in contravention of the plan's terms, it would have done so. Indeed, in *Hogle*, this court observed that "[t]he post-REA decisions indicate that state domestic relations orders concerning pension benefits must now comply with the requirements for QDROs; otherwise, they are preempted by ERISA." *Id.* at 1281.

Although we fully embrace the notion that the children's interests are—and should be—paramount, we find no compelling support for Wendy's argument that she is entitled to immediate distribution of benefits under Guy's Plan. As noted above, the Plan provides only four classes of benefits, and Wendy was not eligible for a payout of the benefits because of Guy's ineligibility. Therefore, we cannot say that the trial court abused its discretion in granting the Plan's motion to correct error.

The judgment of the trial court is affirmed.

RILEY, J., and ROBB, J., concur.