# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JOHN B. STEINHART**
Lafayette, Indiana

ATTORNEY FOR APPELLEE:

**SHANA D. LEVINSON**
Levinson & Levinson
Merrillville, Indiana

FILED

May 29 2013, 9:37 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

|  |  |  |
|---|---|---|
| JILL FINFROCK a/k/a JILL BASTONE, | ) | |
| Appellant- Petitioner, | ) | |
| vs. | ) | No. 64A05-1209-DR-489 |
| MARK FINFROCK, | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE PORTER CIRCUIT COURT
The Honorable William A. Alexa, Judge
The Honorable Katherine R. Forbes, Magistrate
Cause No. 64D02-9404-DR-1058

**May 29, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Jill Bastone (f/k/a Jill Finfrock) ("Mother") requested that the Porter Superior Court issue a Qualified Domestic Relations Order ("QDRO") ordering that funds in the retirement account of her former husband, Mark Finfrock ("Father"), be applied to satisfy Father's substantial child support arrearage. After initially granting the request, the trial court rescinded the QDRO and ordered Mother to pay attorney fees to Father. Mother now appeals and argues: (1) that the federal Fair Debt Collection Practices Act is inapplicable to the present case; (2) that the trial court erred in refusing to issue a QDRO; and (3) that the trial court erred by ordering Father's child support payments to be made to the Indiana State Central Collections Unit ("INSCCU").

We affirm in part, reverse in part, and remand.

**Facts and Procedural History**

Mother and Father were divorced in Porter County, Indiana. Pursuant to the dissolution decree entered on October 24, 1994, Father was to pay support for the couple's two minor children in the amount of $161.54 per week. Father paid this amount in child support for not quite seven months, until May 14, 1995, paying a total of approximately $6,500. Father then lost his job and stopped paying his support obligation. When Father attempted to find a new job, his former employer sued him for breach of a covenant not to compete. In May 1995, Mother and the children moved to Cook County, Illinois, where Mother registered the order of the Porter Superior Court. Father never made any child support payments after this point, and Mother never sought to have Father found in contempt for failing to pay. Eventually, both parties formed new families with new spouses, made new lives for themselves, and had no further contact.

2

Approximately sixteen years later, on July 5, 2011, Father received a telephone call from James Dunham, the founder of National Child Support, a child-support collection firm based in Ohio. According to the trial court's findings of fact, Dunham told Father that Mother wanted him to pay all of the accrued child support, plus interest. Dunham also told Father that, if he did not immediately agree to pay this amount, Dunham could have him arrested for contempt, file a motion to revoke all of his licenses, including his drivers license and professional licenses, freeze his assets and bank accounts, and seize his property and the contents of his home.

Father immediately retained counsel, and on July 15, 2011, filed a motion to set the amount of his child support arrearage and to establish a payment plan. Father filed this motion in Cook County, Illinois because neither he nor Mother had lived in Indiana since the divorce, the Indiana divorce decree had been registered in Cook County, and he had been told that Mother still lived in Illinois. However, five days later, Mother, represented by an attorney employed by National Child Support, filed a petition to set arrearage and reduce the amount to a judgment in Porter Superior Court. At a hearing in Porter Superior Court, Mother's attorney claimed that Father had filed his motion in Cook County, Illinois in an attempt to delay his liability.[1] In reality, however, Father had filed his motion in Illinois before Mother filed her motion in Porter Superior Court.

---

[1] On appeal, Mother claims that this did not occur. However, the trial court's findings of fact indicate that Mother's attorney "stated in open court on June 20, 2012, that Father, in an effort to thwart and/or stall this action and dodge liability for his debt, responded to the Indiana action by filing his case elsewhere. The evidence shows that Father actually filed in Illinois first and had a rational basis to do so." Appellee's App. pp. 5-6. Mother claims that this finding is clearly erroneous. However, Mother has not provided us with a transcript of the June 20, 2012 hearing. Moreover, Mother admits that, at a hearing held on June 21, 2012, her attorney criticized Father's filing of his motion in Cook County, calling it

3

Father eventually gave up his argument regarding proper venue, and on December 2, 2011, came to an agreement with Mother regarding his child support arrearage. The agreed order provided in relevant part:

1. That this Court shall maintain jurisdiction over the collection of child support unless both parties agree otherwise at some later time.

2. That [Father] was previously ordered by this Court to pay child support in the amount of $161.54/week and has failed to pay as ordered.

3. That the arrearage to date is $135,856.74. Said amount is reduced to judgment.

4. That the children of the parties are now emancipated and no current support shall accrue.

5. That [Father] shall pay [Mother] the amount of $280.00 per week (payable every other week in the amount of $560) via the Income Withholding Order attached hereto.

6. That the address of the payee is . . . Cincinnati, OH 45242.

7. That should [Father] change employment, he shall make his attorney aware of said change instanter and cause a new Income Withholding Order to issue.

Appellant's App. pp. 40-41. Within one month, the payments started to be automatically withdrawn from Father's paycheck, and Father never missed a payment.[2]

---

"ridiculous." Tr. p. 21. We will not look behind the trial court's factual finding under these circumstances.

[2] The trial court found that Mother assigned her child support arrearage judgment to National Child Support. On appeal, Mother argues that this is incorrect and that National Child Support simply represented her on a contingency fee basis. At the proceedings supplemental hearing the trial court asked whether the money from Father's withholding order was going to Mother or to National Child Support. Father's attorney claimed that the judgment had been assigned to National Child Support, stating, "She has assigned it." The court then repeated, "Okay. She assigned it." Mother's attorney then stated, "We agreed to that." Tr. p. 23. This colloquy could be understood to mean that Mother's counsel admitted that the judgment had been assigned. But Mother's attorney also stated that, once National Child Support receives a payment, "it's put in an escrow account and we divvy it from there." Id. Thus, it appears that Mother still has some interest in the amount received from Father's income withholding order.

We also note that we have held that "contingency fee contracts for any proceeding arising out of a divorce are void as against the public policy of this state." Mason v. Mason, 561 N.E.2d 809, 811 (Ind. Ct. App. 1990). Because divorce, including post-decree actions, "create an emotional atmosphere in which distraught parties are especially vulnerable to agreeing to a contract which turns out to be

4

Nevertheless, Mother's counsel filed a motion for proceeding supplemental, seeking to discover if Father had any non-exempt assets that could be subject to attachment to satisfy the arrearage that had been reduced to judgment. The motion requested that the trial court, after holding a hearing, issue an appropriate order to apply any non-exempt property to satisfy the judgment against Father. In third-party discovery pursuant to the proceeding supplemental, Mother discovered that Father owned a 403(b) retirement account with his current employer that contained approximately $36,000. Then, before the proceeding supplemental hearing took place, Mother's counsel delivered[3] to the trial court a proposed QDRO, without serving it on Father's counsel. The trial court, "assuming that an order presented in this fashion was approved by both parties or was an Order of the Court," signed the QDRO. Appellant's App. p. 6. The administrator of Father's retirement plan then sent a check to National Child Support for the entire balance of Father's retirement account and drafted a 1099R tax form so that Father could pay the 20% tax penalty for the early withdrawal.

Upon learning of this, Father filed an emergency petition to set aside the QDRO, which the trial court granted in time to stop the transfer of funds. Father then requested sanctions and attorney fees against Mother's counsel and argued that the trial court should not issue a QDRO to attach his retirement account to satisfy the arrearage

---

oppressive, . . . Indiana's public policy is advanced by refusing to permit an attorney to acquire a contingent financial interest in any aspect of the divorce proceeding." Id. While this analysis may merit reconsideration, this issue is not before us.

[3] Father claims that this order was hand delivered. Mother vigorously contests this. Regardless of how the QDRO was delivered to the court, it is undisputed that Mother's counsel did deliver the QDRO to the trial court.

judgment. The trial court held a hearing on the matter on June 21, 2012, at the end of which the trial court took the matter under advisement and requested further briefing. On August 31, 2012, the trial court entered an order that rejected Mother's request to issue a QDRO and ordered Mother's attorney to pay $1,645 in attorney fees to Father. Mother now appeals.

## I. Fair Debt Collection Practices Act

Mother first claims that the trial court erred in awarding attorney fees to Father based on alleged violation of the federal Fair Debt Collection Practices Act ("FDCPA") by Mother's attorney. See 15 U.S.C. § 1692 et seq. The trial court, in its order, wrote:

> [Mother's] Counsel's motivation for surreptitiously filing an unsolicited order is questionable given that he and the collection agency he works for stand to gain a minimum 34% of the payout. He should be held to a higher standard under the Fair Debt Collections Act. [Mother's attorney] himself undoubtedly constitutes a "debt collector" under 15 USCA 1692(a), which . . . includes lawyers who regularly collect debt. He is considered by the collection agency to be a "collection specialist," who operates under the Federal Consumer Credit Protection Act and should know better. Counsel committed an unfair debt collection practice and should be admonished to handle these matters more prudently in the future. For this reason and based on the fees Father incurred to handle the emergency created by this hasty filing, Father['s] requests that the Court award attorney fees as presented in Court on June 20, 2012 is granted.

Appellant's App. pp. 7-8 (some citations omitted).

It is clear that an attorney who regularly engages in consumer debt collection activity, even when that activity consists of litigation, is a "debt collector" as defined by the FDCPA. Heintz v. Jenkins, 514 U.S. 291, 299 (1995). However, Mother appears to be correct that the FDCPA is not applicable to "debt" that is the result of a child support arrearage, even if that arrearage has been reduced to a judgment.

6

As explained in Mabe v. G.C. Servs. Ltd., 32 F.3d 86, 87 (4th Cir. 1994), "Congress enacted the FDCPA to protect consumers from unfair debt collection practices." Thus, "a threshold requirement for application of the FDCPA is that the prohibited practices are used in an attempt to collect a 'debt.'" Id. The term "debt" is defined by the FDCPA as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). "The type of transaction which creates a debt under the FDCPA is one in which 'a consumer is offered or extended the right to acquire money, property, insurance, or services which are primarily for household purposes and to defer payment[.]" Id. (quoting Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1168-69 (3d Cir. 1987)) (internal quotation marks omitted). The Mabe court concluded that the appellants' child support obligations did not qualify as "debts" under the FDCPA because they were not incurred to receive consumer goods or services; instead the child support obligation was imposed to force the appellants to "fulfill their parental duty to support their children." Id.

We believe that this is an accurate and reasonable distinction. Father's arrearage judgment is based on his parental duty to support his children. It is not a "debt" as defined in the FDCPA. See Mabe, 32 F.3d at 87; Turner v. Cook, 362 F.3d 1219, 1227 (9th Cir. 2004) (holding that child support obligations are not "debts" under the FDCPA); Okoro v. Garner, 21 F. App'x 486, 488 (7th Cir. 2001) (holding that child support is not a debt under the FDCPA); Campbell v. Baldwin, 90 F. Supp. 2d 754, 757 (E.D. Tex. 2000)

7

(noting that courts have been unanimous in holding that child support payments are not "debt" as defined by the FDCPA).

Because the trial court's award of attorney fees to Father was based on perceived violations of the FDCPA, which is inapplicable to the present situation, we agree with Mother that the trial court erred in awarding attorney fees based on these perceived violations.

## II. Appropriateness of Issuing QDRO

Mother next argues that the trial court erred in refusing to issue a QDRO attaching Father's retirement account. As this court noted in Hogle v. Hogle, 732 N.E.2d 1278, 1281 (Ind. Ct. App. 2000), "It is well established that, under certain circumstances, a pension may be attached or garnished as a means of satisfying a support arrearage." Domestic relations orders concerning pension benefits must comply with the requirements for a QDRO, otherwise they are preempted by ERISA. Id.

Thus, pension funds may, under some circumstances, be garnished or attached by means of a QDRO in order to satisfy a past-due support obligation. Id. (citing In re Marriage of Rife, 529 N.W.2d 280, 281 (Iowa 1995)). ERISA was not intended to be "a vehicle for avoidance of family support obligations, and nothing in the ERISA statutes prohibits 'invasion of the corpus' of a retirement or pension plan to satisfy a child support obligation." Id. (quoting Rife, 529 N.W.2d at 281).

In Hogle, this court agreed with those courts that had held that "attachment by means of a QDRO of a former spouse's pension plan does not amount to an improper modification of the final adjudication of property rights even when there has been an

adjudication to the effect that the creditor spouse has no interest in the debtor spouse's pension plan." Id. at 1283 (citing In re Marriage of Bruns, 535 N.W.2d 157, 162 (Iowa Ct. App. 1995); Baird v. Baird, 843 S.W.2d 388 (Mo. Ct. App. 1992)).[4] Therefore, in Hogle, we affirmed the trial court's decision to enter a QDRO that transferred to the mother the father's vested benefits payable under his defined pension plan and the total balance of his defined contribution plan account in order to satisfy an arrearage judgment in excess of $375,000.[5]

However, the fact that entry of a QDRO to attach a retirement account may be an appropriate means to satisfy an arrearage judgment does not mean that the trial court is required to do so whenever there is an arrearage. In fact, in Hogle, we specifically held that a pension plan or retirement account *may* be attached or garnished to satisfy a support arrearage. 732 N.E.2d at 1281. This decision, like all decisions on how to satisfy a judgment, is left to the sound discretion of the trial court. See Fifth Third Bank v. Peoples Nat. Bank, 929 N.E.2d 210, 214 (Ind. Ct. App. 2010) (noting that trial courts have broad discretion in conducting proceedings supplemental).

Here, the trial court noted that the parties had entered into an agreed order whereby Father agreed to pay $280 per week on his support arrearage. Although Mother now claims that this is insufficient to make up for the years when Father flagrantly

---

[4] This is in contrast to those courts that have held that garnishing or attaching a retirement plan via a QDRO may be improper where it has the effect of creating an interest in an asset that did not exist at the time of the dissolution or which was disposed of by the dissolution property settlement. Id. at 1282-83 (citing DeSantis v. DeSantis, 714 So.2d 637, 638 (Fla. Dist. Ct. App. 1998); Hoy v. Hoy, 510 S.E.2d 253, 254 (Va. Ct. App. 1999)).

[5] In Hogle, the father had been ordered to pay $1,000 per month in child support in 1979, and his arrearage was over $375,000 by 1999.

flouted his support obligations, $280 per week is not a trivial sum. Father claims, and Mother does not deny, that this represents almost half of Father's weekly income. This is not a situation where Father's weekly payment is a token sum that will never pay off the arrearage.[6] Moreover, Mother had agreed to these terms of payment. Under these facts and circumstances, we cannot say that the trial court abused its discretion by declining Mother's request to enter a QDRO to attach the entirety of Father's retirement account.

### III. Method of Payment

Mother also complains that the trial court erred in ordering Father to pay his agreed-to weekly payment on his arrearage to the Indiana State Central Collections Unit ("INSCCU") instead of to National Child Support. The relevant portions of the trial court's order states:

> As of May 31, 2011, the federal office of Child Support Enforcement (OCSE) and the Office of Management and Business (OMB) issued new rules regarding the Federal Income Withholding Form. As such, new IWO [income withholding orders] must direct payment to INSCCU. If the IWO does not direct payment to INSCCU as required by federal law, then the employer should reject the IWO and return it to the sender. *Without disturbing the withholding of Father's payments, arguably, to comply with the new legislation, the IWO should be re-drafted to allow the payments to go to INSCCU instead of the collection agent*.

Appellant's App. p. 13 (emphasis added).

We do not read the trial court's order as one requiring that Father's income withholding order *must* be paid to INSCCU. In fact, the order specifically says that it is *not* disturbing Father's current income withholding order. And it mentions that *arguably*

---

[6] A balance of $135,856.74 would take approximately nine years and four months to pay off at $280 per week, not considering any accrued interest. This is not a short period of time, but it is not atypical of large loans.

10

Father's payments should go to INSCCU to comply with federal rules. But since the trial court did not actually order Father's payments to be made to INSCCU, we need not address this issue on appeal.

**Conclusion**

The trial court erred in determining that the FDCPA applied to the present case. Therefore, to the extent that the trial court's award of attorney fees was based on a perceived violation of the FDCPA, this award was improper. The trial court did not abuse its discretion in denying Mother's request for a QDRO to attach Father's retirement account. Lastly, the trial court did not actually alter Father's income withholding order to direct that the payments go to INSCCU, and we need not consider whether the trial court erred in opining that Father's income withholding order should be altered to comply with new federal rules. We therefore reverse the trial court's award of attorney fees, affirm its denial of Mother's request for the entry of a QDRO, and remand for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

BAKER, J., and MAY, J., concur.