# IN THE SUPREME COURT OF TEXAS

━━━━━━

No. 17-0155

━━━━━━

BART DALTON, PETITIONER,

v.

CAROL DALTON, RESPONDENT

━━━━━━

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS

━━━━━━

**Argued February 27, 2018**

JUSTICE BOYD delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE GUZMAN, JUSTICE DEVINE, JUSTICE BROWN, and JUSTICE BLACKLOCK joined.

JUSTICE LEHRMANN filed a concurring opinion.

This appeal challenges trial-court orders enforcing an agreed spousal-support obligation. An Oklahoma court first entered an order approving and incorporating the parties' agreements. When the husband later filed for divorce in Texas, the wife filed the Oklahoma order in the Texas court. The Texas court granted the divorce, incorporating the parties' agreements as approved in the Oklahoma order, and later issued various post-divorce orders to enforce the former husband's obligations. The former husband argues that the court cannot enforce his spousal-support obligation by wage withholding or by an assignment of his retirement benefits to his former wife. The court of appeals rejected both arguments. We agree with the former husband on both points.

We reverse the court of appeals' judgment and render judgment that the wage-withholding order and the order assigning retirement benefits to enforce unpaid spousal support are void.

## I.
## Background

For 150 years, the State of Texas rejected post-divorce alimony as contrary to public policy. *Francis v. Francis*, 412 S.W.2d 29, 32 (Tex. 1967).[1] But Texas courts often approved voluntary spousal-support agreements and incorporated those agreements into divorce decrees. *Id.* at 33. Although courts could enforce those agreements if the paying spouse failed to perform as promised, the obligation remained an agreed duty enforceable as a private contract, rather than a court-ordered duty enforceable as a judgment. *Id.*[2]

In 1995, the Texas Legislature first authorized courts to award a form of involuntary post-divorce alimony referred to as "spousal maintenance." *See* TEX. FAM. CODE § 8.001(1) (defining maintenance as "an award in a suit for dissolution of a marriage of periodic payments from the future income of one spouse for the support of the other spouse."). But Chapter 8 of the Family Code allows spousal-maintenance awards only under "very narrow" and "very limited

---

[1] Texas's earliest divorce statutes provided only for temporary alimony during the pendency of a divorce proceeding. *See* James W. Paulsen, *Remember the Alamo[ny]! The Unique Texas Ban on Permanent Alimony and the Development of Community Property Law*, 56-SPG LAW & CONTEMP. PROBS. 7, 15 (1993). The state rejected post-divorce alimony on the theory that a "just and right" division of the couple's community property would sufficiently support both spouses after the divorce. *See Fitts v. Fitts*, 14 Tex. 443, 453 (1855) ("Generally there would be no necessity for trenching on the separate property of either partner for the benefit of the other. Both would often have separate property, and an equal division of the net amount of the common property would, in the meaning of the statute, be deemed just and right.").

[2] *See also McGoodwin v. McGoodwin*, 671 S.W.2d 880, 882 (Tex. 1984) ("Such an agreement, though incorporated into a final divorce decree, is treated as a contract, and its legal force and its meaning are governed by the law of contracts, not by the law of judgments."); *Ex parte Jones*, 358 S.W.2d 370, 375 (Tex. 1962) ("This agreed judgment must be interpreted as if it were a contract between the parties and the interpretation thereof is governed by the laws relating to contracts, rather than laws relating to judgments.").

circumstances." *McCollough v. McCollough*, 212 S.W.3d 638, 645 (Tex. App.—Austin 2006, no pet.); *Cardwell v. Sicola-Cardwell*, 978 S.W.2d 722, 724 n.1 (Tex. App.—Austin 1998, pet. denied). The former spouse must be "eligible" to receive spousal maintenance;[3] the "duration"[4] and "amount"[5] of the payments must not exceed specified limits; the obligation must automatically terminate upon certain events;[6] and the court must consider a wide variety of factors to "determine the nature, amount, duration, and manner of periodic payments."[7]

---

[3] Generally, a former spouse is eligible to receive spousal maintenance only if the paying spouse was recently convicted of family violence, the parties were married at least ten years, or the receiving spouse or the couple's child has a disability, and the receiving spouse is unable to meet her own "minimum reasonable needs." TEX. FAM. CODE § 8.051.

[4] The court "shall limit the duration of a maintenance order to the shortest reasonable period that allows the spouse seeking maintenance to earn sufficient income to provide for the spouse's minimum reasonable needs," and the order may not last more than five, seven, or ten years, depending on how long the parties were married. *Id.* § 8.054.

[5] "A court may not order maintenance that requires an obligor to pay monthly more than the lesser of: (1) $5,000; or (2) 20 percent of the spouse's average monthly gross income." *Id.* § 8.055(a).

[6] The obligation terminates upon the death of either party, the remarriage of the obligee, or if the obligee "cohabits with another person with whom the obligee has a dating or romantic relationship in a permanent place of abode on a continuing basis." *Id.* § 8.056.

[7] The court must consider "all relevant factors," including:

(1)    each spouse's ability to provide for that spouse's minimum reasonable needs independently, considering that spouse's financial resources on dissolution of the marriage;

(2)    the education and employment skills of the spouses, the time necessary to acquire sufficient education or training to enable the spouse seeking maintenance to earn sufficient income, and the availability and feasibility of that education or training;

(3)    the duration of the marriage;

(4)    the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance;

(5)    the effect on each spouse's ability to provide for that spouse's minimum reasonable needs while providing periodic child support payments or maintenance, if applicable;

3

Chapter 7 of the Family Code continues to encourage divorcing parties to amicably settle their disputes by agreeing to any spousal-support obligations. TEX. FAM. CODE § 7.006(a). But Texas law distinguishes between court-ordered spousal-maintenance awards under Chapter 8 and court-approved voluntary obligations under Chapter 7. *See generally In re Green*, 221 S.W.3d 645, 647–48 (Tex. 2007); *Ex parte Hall*, 854 S.W.2d 656, 656–57 (Tex. 1993). In particular, spousal-maintenance awards are enforceable as court judgments while agreed spousal-support obligations constitute debts enforceable only as a contract. *Green*, 221 S.W.3d at 647.[8] Chapter 8's

---

(6)    acts by either spouse resulting in excessive or abnormal expenditures or destruction, concealment, or fraudulent disposition of community property, joint tenancy, or other property held in common;

(7)    the contribution by one spouse to the education, training, or increased earning power of the other spouse;

(8)    the property brought to the marriage by either spouse;

(9)    the contribution of a spouse as homemaker;

(10)    marital misconduct, including adultery and cruel treatment, by either spouse during the marriage; and

(11)    any history or pattern of family violence, as defined by Section 71.004.

*Id.* § 8.052.

[8] *See also McCollough*, 212 S.W.3d at 648 ("The fact that a court expressly approves [a spousal-support] agreement and incorporates it into the final divorce decree does not transform contractual alimony payments into court-ordered maintenance payments subject to the termination and modification provisions of chapter 8 of the family code."); *In re Dupree*, 118 S.W.3d 911, 914–15 (Tex. App.—Dallas 2003, orig. proceeding) (holding that a "person may contract to support his spouse, and that obligation, to the extent it exceeds his legal duty, is a debt" that is not enforceable by contempt) (citing TEX. CONST. art. I, § 18); *Cardwell*, 978 S.W.2d at 726 ("Texas law mandates that we apply contract principles to determine whether the obligation contained in [an agreed support order] terminated on [the obligor's] death.").

4

enforcement provisions apply only to spousal-maintenance orders that a court enters "on the authority" of Chapter 8 and that meet that chapter's "other requirements." *Id.* at 647–48.[9]

By contrast, the State of Oklahoma treats court-approved spousal-support agreements as judgments, not as mere contractual obligations. *Dickason v. Dickason*, 607 P.2d 674, 678 (Okla. 1980). When an Oklahoma court approves a voluntary support agreement and incorporates it into a court order, the agreement "merges into the decree" and is "extinguished by force of law." *Id.* at 677. As a result, the parties' rights and obligations "cease to be contractual" and instead are "governed and become enforceable as a judgment." *Id.* The obligation, although voluntarily created, no longer constitutes a debt and becomes enforceable by contempt and other judgment-enforcement methods. *Potter v. Wilson*, 609 P.2d 1278, 1281 (Okla. 1980).

In this case, an Oklahoma court entered an order approving and incorporating Bart and Carol Dalton's separation agreement. The Oklahoma order approved the Daltons' agreements regarding child custody and support, division of their marital property and debts, spousal support, attorney's fees, and costs. Regarding spousal support, the Oklahoma order required Bart to pay Carol "support alimony" of $6,060.25 per month until he had paid $1,309,014.00. Regarding property division, the order assigned "all right, title, and interest" in one-half of Bart's 401(k) and profit-sharing plans to Carol. After the Oklahoma court entered the agreed order, Bart and Carol separated, Carol moved to Texas, and Bart later followed. Bart filed for divorce in a Texas court. Carol filed a counterpetition for divorce and filed the Oklahoma order with the Texas court.

---

[9] *See also McCollough*, 212 S.W.3d at 645 (holding Chapter 8's enforcement provisions apply "only [to] those forms of 'spousal maintenance payments' governed by the act, not to contractual alimony previously permitted under Texas law").

5

Before the Texas court rendered a final divorce decree, it entered a summary-judgment order declaring that the Oklahoma order constitutes "a final judgment entitled to full faith and credit by the Texas Courts."[10] It also found that Bart was in arrears on his support obligations and held him in contempt. The court issued a wage-withholding order requiring Bart's employer to withhold some of his earnings to satisfy his monthly child-support and support-alimony obligations. It later entered a "qualified domestic relations order" (commonly called a "QDRO") making up for some of Bart's arrearages by assigning Carol an additional interest in Bart's retirement accounts.

Bart and Carol's divorce was made final in 2011. Consistent with the earlier summary judgment, the Texas court's final divorce decree incorporated the Oklahoma order approving the parties' agreement. Neither Bart nor Carol challenged the final divorce decree.

Soon after the final decree, Carol alleged that Bart continued to fall short on his support-alimony obligations. In response to Carol's post-divorce motions, the Texas court entered an additional QDRO to enforce Bart's spousal-alimony obligations, assigning Carol additional interests in Bart's retirement accounts. The court also denied and dismissed Bart's motions to terminate and vacate the earlier wage-withholding order. Ultimately, the court again found Bart in contempt and entered a judgment awarding Carol $269,665.19.

---

[10] The trial court denied Carol's first summary-judgment motion, finding that the Oklahoma order was void, not final, and not entitled to full faith and credit in the Texas court. It later granted Carol's second summary-judgment motion, finding that the order was a valid and enforceable partition-and-exchange agreement under Texas law. On agreed interlocutory cross-appeals, the court of appeals reversed the trial court's denial of Carol's first summary-judgment motion and held that the Oklahoma order is an enforceable, final judgment entitled to full faith and credit. *In re Marriage of Dalton*, 348 S.W.3d 290, 292–93, 298 (Tex. App.—Tyler 2011, no pet.). Bart did not petition for review, and the trial court entered summary judgment consistent with the appellate court's holding.

6

Bart appealed, challenging (1) the order finding him in contempt, (2) the final QDRO, and (3) the order dismissing his motion to vacate the wage-withholding order. While his appeal was pending, the trial court conducted an additional hearing, ordered Bart to forty-five days' confinement if he did not pay the arrearages, and entered a first-amended QDRO increasing the amount awarded to Carol from Bart's retirement accounts. Bart supplemented his notice of appeal to include both of these orders. The court of appeals modified the judgment to reduce the amount of Bart's arrearages but otherwise affirmed. — S.W.3d —, —, 2017 WL 104639, at *3 (Tex. App.—Tyler 2017). Bart petitioned for our review, challenging the trial court's wage-withholding order and the amended QDRO,[11] and we granted his petition.

## II.
## Wage Withholding

Bart argues that the trial court erred by ordering his employer to withhold a portion of his wages to satisfy his spousal-support obligations. We agree that the trial court erred because Texas law does not permit wage withholding in this case, and the fact that an Oklahoma court first entered the agreed support order does not change that result.

The Texas Constitution prohibits the garnishment of current wages for personal service, "except for the enforcement of court-ordered" child-support payments or "spousal maintenance." TEX. CONST. art. XVI, § 28.[12] Chapter 8 of the Family Code expressly allows a court to order "that

---

[11] Bart does not challenge the trial court's contempt order in this Court.

[12] This constitutional prohibition against the garnishment of wages appeared in Texas's 1876 Constitution and remained unchanged until a 1983 amendment providing the current exception "for the collection of child support." *Caulley v. Caulley*, 806 S.W.2d 795, 799 (Tex. 1991) (Mauzy, J., concurring). After the Legislature statutorily

7

income be withheld from the disposable earnings" of a spouse in "a proceeding in which periodic payments of spousal maintenance are ordered, modified, or enforced." TEX. FAM. CODE § 8.101(a).[13] The statute thus permits wage withholding, but—consistent with the constitutional prohibition—only to enforce a court-ordered obligation that qualifies as "spousal maintenance." *See, e.g.*, *Kee v. Kee*, 307 S.W.3d 812, 813 (Tex. App.—Dallas 2010, pet. denied) (explaining that Chapter 8 allows wage withholding only "for spousal maintenance payments ordered thereunder"). Here, the Oklahoma order neither orders spousal maintenance nor approves an agreement to pay spousal maintenance.

Carol argues that Bart's support-alimony obligation constitutes spousal maintenance because section 8.001(1) defines "maintenance" as an award of payments by one spouse "for the support" of the other. TEX. FAM. CODE § 8.001(1). Bart agreed to pay alimony under Oklahoma law, and according to Carol, "there is no real difference between 'alimony,' as ordered here by the Oklahoma court, and 'spousal maintenance' within the meaning of the Texas constitution," because both involve a spouse's payments "for the support" of the other.

We have explained, however, that although Chapter 8 "broadly define[s]" the term maintenance, an order requiring spousal support does not award "spousal maintenance" under Chapter 8 unless it complies with the statute's eligibility, duration, termination, and other

---

permitted spousal-maintenance awards in 1995, this section was again amended in 1999 to provide the additional exception for the enforcement of "spousal maintenance." *See* TEX. CONST. art. XVI § 28.

[13] The court effectuates wage withholding by ordering the court clerk to issue and deliver a "writ of withholding" to the spouse's employer, "directing that earnings be withheld for payment of spousal maintenance as provided by this chapter." TEX. FAM. CODE § 8.001(5).

requirements. *Green*, 221 S.W.3d at 647. Here, neither the Texas trial court nor the Oklahoma court found—nor does the record reflect—that Carol was eligible for spousal maintenance under Chapter 8. *See* TEX. FAM. CODE § 8.051 (describing eligibility requirements). Carol never argued to the trial court—when registering the Oklahoma order in Texas, filing her counterpetition for divorce, or moving for enforcement—that she was eligible to receive spousal maintenance. To the contrary, when questioned on the applicability of Chapter 8, Carol testified that her agreements with Bart regarding support never "even touched on the possibility" that she was eligible for Chapter 8 spousal maintenance. Bart likewise testified that Carol never indicated an "intent at any time to have anything to do with the maintenance statutes in Texas." And Carol has not argued to this Court that she could have qualified under Chapter 8 or that she has not been afforded the opportunity to claim eligibility.[14]

We conclude that neither the Oklahoma order nor the Texas trial court's decree required Bart to pay spousal maintenance; instead, they required him to provide "support alimony" that "falls outside of Chapter Eight." *Green*, 221 S.W.3d at 647–48. As explained, under Texas law, an order incorporating a voluntary support obligation that does not qualify as spousal maintenance creates a debt that is enforceable as a contract, not a court-ordered obligation that is enforceable as a judgment. *Id.* Courts cannot use wage withholding to enforce such an order unless the parties specifically agreed to that enforcement method. TEX. FAM. CODE § 8.101(b)(1); *see also Kee*, 307

---

[14] JUSTICE LEHRMANN would hold that a former spouse should be afforded an opportunity *at the time she seeks enforcement* to establish that she was eligible for Chapter 8 spousal maintenance *at the time of the divorce. Post* at __. We do not address that issue because Carol has never argued that she was eligible for spousal maintenance or that she should have been given an opportunity to establish that she was.

S.W.3d at 816 ("The parties' Agreement did not provide for enforcement by income withholding. Accordingly, such remedy is not available to Wife."); *cf. Holland v. Holland*, 357 S.W.3d 192, 199 (Tex. App.—Dallas 2012, no pet.) (distinguishing *Key* because "the agreement in this case provides for enforcement by income withholding"). As in *Key*, the Daltons' agreement did not provide for wage withholding.

Citing section 8.101(a-2), which she asserts codified the rulings in *Green* and *Key*, Carol argues that only "any agreed amount *in excess* of [Chapter 8's] limits is 'a contractual debt that cannot be enforced by contempt.'" (Emphasis added.) If by this assertion Carol means to argue that Chapter 8 authorized the court to order Bart's employer to withhold wages up to the monthly amount Chapter 8 permits, we disagree. Subsection (a-2) prohibits wage withholding "*to the extent that any provision of an agreed order for maintenance* exceeds the amount of periodic support the court could have ordered under this chapter or for any period *of maintenance* beyond the period of maintenance the court could have ordered under this chapter." TEX. FAM. CODE § 8.101(a-2) (emphases added).[15] While this section suggests that the parties may agree to a spousal-maintenance order that requires payments that exceed the amount or duration Chapter 8 permits, the provision applies only if the parties agreed to an "order for maintenance" under Chapter 8. So parties may agree to a spousal-maintenance order under Chapter 8 that requires payments exceeding Chapter 8's amount and duration limits, and the court can order wage withholding to

---

[15] Similarly, section 8.059(a-1) provides that a "court may not enforce *by contempt* any provision of an agreed order for maintenance that *exceeds the amount* of periodic support the court could have ordered under this chapter or for any period of maintenance *beyond the period* of maintenance the court could have ordered under this chapter." *Id.* § 8.059(a-1) (emphases added). As noted, however, Bart has not challenged the trial court's contempt order in this Court.

enforce the order only up to those limits. But as we have explained, nothing in the Oklahoma order indicates that the Daltons agreed to spousal maintenance under Chapter 8, and nothing in the record indicates that Carol could have established her eligibility for Chapter 8 spousal maintenance. We thus conclude that Chapter 8 does not authorize the trial court's wage-withholding order in this case, even up to the statutory limits.

Carol argues, however, that *Oklahoma* law authorizes the wage-withholding order, and because the Texas divorce decree is based on an Oklahoma order, we must give full faith and credit to Oklahoma law. Again, we disagree. We agree with Carol that the Oklahoma order became a final, enforceable Texas judgment when she properly filed an authenticated copy of the order in a Texas court. TEX. CIV. PRAC. & REM. CODE § 35.003(a); *Walnut Equip. Leasing Co. v. Wu*, 920 S.W.2d 285, 286 (Tex. 1996) (per curiam). A foreign judgment properly filed in a Texas court is "entitled to full faith and credit in this state," TEX. CIV. PRAC. & REM. CODE § 35.001, and the law of Oklahoma, as the issuing state, governs "the nature, extent, amount, and duration of current payments under" the Oklahoma order. TEX. FAM. CODE § 159.604(a)(1). But when it comes to enforcement procedures, Texas law provides that the order "has the same effect and is subject to the same procedures, defenses, and proceedings for reopening, vacating, staying, enforcing, or satisfying a judgment as a judgment of the court *in which it is filed*." TEX. CIV. PRAC. & REM. CODE § 35.003(c) (emphasis added).

Article IV section 1 of the United States Constitution requires "that each state give full faith and credit to the public acts, records, and judicial proceedings of every other state." *Bard v. Charles. R. Myers Ins. Agency*, 839 S.W.2d 791, 794 (Tex. 1992) (citing U.S. CONST. art. IV, § 1).

A foreign judgment properly filed in a Texas court "must be recognized and given effect coextensive with that to which it is entitled in the rendering state, . . . regardless of the laws or public policy" of Texas. *Id.*; *see also State of Washington v. Williams*, 584 S.W.2d 260, 261 (Tex. 1979) ("The general rule is that a judgment rendered by a court of one state is . . . entitled to recognition, force or effect, . . . to the same extent as it has by law or usage in the courts of the state where the judgment was rendered."). Carol argues that the full-faith-and-credit clause requires Texas courts to recognize the Oklahoma order as a final judgment enforceable by wage withholding, consistent with Oklahoma law, even if Texas law and public policy prohibit that enforcement method.

We agree that the full-faith-and-credit clause requires Texas to recognize the Oklahoma order as a final judgment requiring Bart to pay spousal-support to Carol, but that does not make it a final judgment requiring Bart to pay spousal maintenance under Chapter 8. The full-faith-and-credit clause does not require states to "adopt the practices of other States regarding the time, manner, and mechanisms for enforcing judgments." *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 235 (1998). Although the "duty to give effect to [the order] clearly results from the full faith and credit clause, the modes of procedure to enforce the collection may not be the same in both states." *Sistare v. Sistare*, 218 U.S. 1, 26 (1910).[16]

---

[16] *See also Rosin v. Monken*, 599 F.3d 574, 576 (7th Cir. 2010) ("Illinois's recognition of the New York order does not carry with it an obligation that Illinois enforce that order in the manner which [New York] apparently prescribes."); *City of Philadelphia v. Bauer*, 478 A.2d 773, 778 (N.J. 1984) ("Although judgments of sister states must be given full faith and credit, local law may determine the scope and nature of available remedies."); *Nat'l Union Fire Ins. v. Greene*, 985 P.2d 590, 593 (Ariz. Ct. App. 1999) ("The Full Faith and Credit Clause does not make the laws of the rendering state applicable in enforcing the judgment.").

Although Oklahoma has chosen to allow wage withholding to enforce all agreed spousal-support orders, the full-faith-and-credit clause does not require Texas to honor that choice. Texas has instead chosen to apply its own enforcement methods: to enforce a "registered support order issued in another state . . . in the same manner and . . . subject to the same procedures as an order issued by a tribunal of this state." TEX. FAM. CODE § 159.603(b); *see also id.* § 159.604(c) (providing that a "responding tribunal of this state shall apply the procedures and remedies of this state to enforce current support and collect arrears and interest due on a support order of another state . . . registered in this state"). So the Texas trial court was required to accept the Oklahoma order as an adjudication of the Daltons' respective rights and obligations, but Texas law governs the methods by which the Texas court could enforce those rights and obligations. *See Johnson v. Johnson*, 13 S.E.2d 593, 595 (S.C. 1941) (holding full-faith-and-credit clause did not govern "the method of collecting" an alimony judgment, "and the procedure of enforcement to be followed is a matter exclusively for our Courts"); *Sainz v. Sainz*, 245 S.E.2d 372, 375 (N.C. App. 1978) (refusing to apply foreign state's methods for enforcing alimony judgment because the "methods by which a judgment of another state is enforced are determined by the local law of the forum."). And as we have explained, Texas law allows wage withholding only to enforce spousal-maintenance orders under Chapter 8.

Finally, Carol argues that because, under Oklahoma law, the Oklahoma order incorporating the Daltons' agreement "extinguished" the agreement and left only a court order enforceable as a judgment, *see Dickason*, 607 P.2d at 677, Texas courts must treat it as judgment awarding spousal maintenance under Chapter 8. Again, we disagree. Although the order constitutes a spousal-

13

support judgment under Oklahoma law, it is not a spousal-maintenance award under Texas law. The full-faith-and-credit clause requires Texas to accept the Oklahoma order as a final judgment, but our Constitution and Chapter 8 allow wage withholding only to enforce spousal maintenance. Wage withholding is not available to support all spousal-support judgments in Texas. We thus hold that the court of appeals erred by affirming the trial court's orders denying and dismissing Bart's motions to terminate and vacate the court's wage-withholding order.

### III.
### Retirement Benefits

Bart also challenges the trial court's post-divorce order assigning Carol an interest in his retirement accounts. He argues that under the Family Code, the trial court was required to apply Texas procedures and remedies to enforce his support obligations and no Texas procedure or remedy allowed the court to assign Carol more interests in Bart's retirement accounts than were assigned in the final divorce decree. We agree with Bart that Texas procedures and remedies apply and that Texas law does not authorize the trial court's order in this case.

In seeking to garnish Bart's retirement benefits for the alimony he owed, Carol petitioned the trial court for a QDRO "pursuant to 29 U.S.C. § 1056(d)(3)." In granting her petition, the trial court likewise made its order "pursuant to 29 U.S.C. § 1056(d)(3)." Neither Carol nor the trial court identified any Texas law authorizing the order. Carol argues, however, that what Texas law does or does not authorize is immaterial because the federal Employee Retirement Income Security Act (ERISA) (of which section 1056(d)(3) is a part) "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). We agree

14

that ERISA preempts any Texas law relating to employee benefit plans, but here, there is no Texas law that ERISA would preempt.

ERISA was enacted "to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." *Id.* § 1001(b); *see Boggs v. Boggs*, 520 U.S. 833, 845 (1997) ("The principal object of the statute is to protect plan participants and beneficiaries."). To that end, ERSIA includes an anti-alienation clause that generally prohibits any assignment of retirement benefits. 29 U.S.C. § 1056(d)(1); *see Guidry v. Guidry*, 493 U.S. 365, 376 (1990) ("Section 206(d) [the anti-alienation clause] reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. . . . [T]he effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between the parties."). This prohibition broadly applies to a "domestic relations order," including an order approving a property-settlement agreement, that "relates to the provision of . . . alimony payments, or marital property rights to a spouse [or] former spouse" and "is made pursuant to a State domestic relations law." 29 U.S.C. § 1056(d)(3)(B)(ii). But ERISA's prohibition against assignments does not apply to a "*qualified* domestic relations order"; instead, ERISA *requires* pension plans to "provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." *Id.* § 1056(d)(3)(A) (emphasis

15

added).[17] A pension plan that receives a valid QDRO must pay the plan benefits to the spouse or former spouse designated as an alternate payee. *See id.* § 1056(d)(3)(H)(ii), (J), (K).

ERISA's anti-alienation and preemption clauses do not, however, grant a state court authority to issue an order that the state's law does not authorize. *See Boggs*, 520 U.S. at 851 (looking to state law to determine whether assignment of retirements benefits was proper in a QDRO). ERISA does not strip a state's power to determine how it will govern divorce and support issues in its borders. *See id.* at 848 ("As a general matter, '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.' Support obligations, in particular, are 'deeply rooted moral responsibilities' that Congress is unlikely to have intended to intrude upon.") (quoting *In re*

---

[17] A qualified domestic relations order is a domestic relations order that:

(1)    "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan";

(2)    "clearly specifies" (i) the plan participant's and the alternate payee's name and last-known mailing address; (ii) "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined"; (iii) "the number of payments or period to which such order applies"; and (iv) "each plan to which such order applies";

(3)    "does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan";

(4)    "does not require the plan to provide increased benefits (determined on the basis of actuarial value)"; and

(5)    "does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order."

29 U.S.C. § 1056(d)(3)(B)(i), (C), and (D).

*Burrus*, 136 U.S. 586, 593–94 (1890)); *see also Hisquierdo v. Hisuquierdo*, 439 U.S. 572, 583 ("The federal nature of [retirement] benefits does not by itself proscribe the entire field of state control."). ERISA only supersedes that power when state law runs contrary to its own provisions. *See Hisquierdo*, 439 U.S. at 584 ("Like anti-attachment provisions generally, [the provision of the Railroad Retirement Act] ensures that the benefits actually reach the beneficiary. It pre-empts all state law that *stands in its way*.") (emphasis added) (internal citations omitted).

The only power ERISA grants to a pension plan administrator is the power to *review* an existing order to determine whether it is a qualified domestic relations order under the Act. *See* 29 U.S.C. § 1056(d)(3)(G)(i)(II) ("[T]he plan administrator shall determine whether such an order is a qualified domestic relations order and notify the participant and each alternate payee of such determination."). Thus, any power the trial court had to enter the post-divorce order must come from state law. *See Hogle v. Hogle*, 732 N.E.2d 1278, 1284 (Ind. Ct. App. 2000) ("Since ERISA does not provide an enforcement mechanism for collecting judgments, state law methods for collecting money generally remain undisturbed by ERISA.").[18] If no state law authorizes the order, ERISA does not apply, and the trial court still lacked authority to enter the order at issue.

Chapter 8, the Texas Family Code's chapter on "Maintenance," provides for enforcement "by any means available for the enforcement of judgment for debts." TEX. FAM. CODE § 8.059(b). But Carol cannot avail herself of Chapter 8's remedies because she does not have a court order for Chapter 8 spousal maintenance. Likewise, while Chapter 159 (Texas's enactment of the Uniform

---

[18] Although *Hogle* notes that state law must authorize garnishment of retirement benefits, it does not reference what Indiana law allows garnishment under the facts of that case.

17

Interstate Family Support Act) allows a Texas court, in enforcing a foreign support order, to "set aside property for satisfaction of the support order," the Act does not grant the court power it does not otherwise have. *See* TEXAS ANNOTATED FAMILY CODE (2012 ed.) 1097 cmt. ("[T]he Act explicitly states that a tribunal is not granted powers that it does not otherwise possess under state law."). Chapter 154 allows for enforcement of judgments under that chapter "by all remedies available for enforcement of a judgment," TEX. FAM. CODE § 154.124(c), and it specifically authorizes a trial court to "set[] aside property," *id.* § 154.003(4), but Chapter 154 applies only to child support. The only other possible source for the trial court's power to issue a QDRO to enforce a contractual and voluntary support agreement is Chapter 9.

Chapter 9 governs post-decree proceedings, and it identifies four types of those proceedings: suits to enforce the decree (covered in subchapter A), post-decree QDROs (subchapter B), post-decree division of property (subchapter C), and the disposition of undivided beneficial interests (subchapter D). Subchapter A allows post-decree orders to enforce and effectuate the decree's property division (including dividing retirement benefits) made under section 7.003, but it does not allow orders that alter that division. *Id.* § 9.007(a) (stating that Texas courts generally have no power to "amend, modify, alter, or change the division of property made or approved in the decree of divorce or annulment"). The court hearing an enforcement suit under subchapter A "may render further orders," but only "to enforce the division of property *made or approved in the decree of divorce or annulment.*" *Id.* § 9.006(a) (emphasis added); *see also id.* § 9.004 (stating that subchapter A's "procedures and limitations" do not apply "to existing property not divided on divorce"). And "the court may specify more precisely the manner of effecting the

18

property division," but only the division "previously made or approved" and only "if the substantive division of property is not altered or changed." *Id.* § 9.006(b).

So subchapter A confirms that "[a]n order to enforce the division is limited to an order to assist in the implementation of or to clarify the prior order and may not alter or change the substantive division of property." *Id.* § 9.007(a). And any order "that amends, modifies, alters, or changes the actual, substantive division of property made or approved in a final decree of divorce or annulment is beyond the power of the divorce court and is unenforceable." *Id.* § 9.007(b). Under subchapter A, any post-decree enforcement order cannot alter the decree's substantive property division. The question, then, is whether subchapter B, which addresses QDROs, provides otherwise.

Subchapter B allows a party to sue to enforce "a decree of divorce or annulment providing for a division of property" by "an enforceable qualified domestic relations order or similar order permitting payment of pension, retirement plan, or other employee benefits divisible under the law of this state or of the United States to an alternate payee or other lawful payee." *Id.* §§ 9.001(a), .101(a). But a suit seeking a QDRO under subchapter B applies only "to a previously divided pension, retirement plan, or other employee benefit." *Id.* § 9.101(b). The court may enter a post-decree QDRO if the court did not enter a QDRO when it entered the "final decree of divorce or annulment or another final order *dividing property*," *id.* § 9.103 (emphasis added), or to "correct" or "clarify" a prior QDRO "to effectuate the division of property ordered by the court" in the final decree, *id.* § 9.1045(a). All these provisions exist to enable the court "to effect payment of retirement benefits *that were divided by a previous decree*." *Id.* § 9.105 (emphasis added).

19

Reading subchapters A and B together, we have expressly confirmed that trial courts are "without authority to enter a QDRO altering the terms of the decree." *Shanks v. Treadway*, 110 S.W.3d 444, 449 (Tex. 2003). A QDRO "cannot change the substantive division of property made in the original decree." *Id.* The court can enter a "clarifying order" to "enforce compliance with an insufficiently specific decree," but it "may not amend, modify, alter, or change the division of property made or approved in the decree of divorce." *Id.* (citing TEX. FAM. CODE §§ 9.008(b), .007(a)).

The courts of appeals agree that a "suit seeking a QDRO applies to a *previously divided* pension, retirement plan, or other employee benefit." *DeGroot v. DeGroot*, 260 S.W.3d 658, 665 (Tex. App.—Dallas 2008, no pet.) (emphasis added). The "procedures and limitations of a suit to enforce do not apply to existing property *that was not divided in the divorce.*" *Id.* (emphasis added). As "with any post-divorce enforcement or clarification order, a QDRO may not amend, modify, alter, or change the division of property made or approved in the decree of divorce or annulment." *Gainous v. Gainous*, 219 S.W.3d 97, 107 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *see also In re Marriage of Jones*, 154 S.W.3d 225, 228 (Tex. App.—Texarkana 2005, no pet.). A QDRO "may more precisely specify the manner of carrying out the property division previously ordered," but only "so long as the substantive division of the property is not altered." *Vaughn v. Vaughn*, No. 03-04-00030-CV, 2005 WL 1115965, at *6 (Tex. App.—Austin May 12, 2005, no pet.) (mem. op.). Any QDRO that alters the decree's property division is "void." *Gainous*, 219 S.W.3d at 108.

20

Bart's retirement plans were indeed divided by previous decrees; the Oklahoma order granted Carol one-half of Bart's plans as part of their agreed property division, and the final divorce decree incorporated that order. But the post-judgment order at issue does not purport to effectuate the assignment of *those* benefits; it seeks to enforce payment of a separate obligation in the Oklahoma order of "support alimony." Neither the Oklahoma order nor the final divorce decree divided Bart's retirement plans to pay *that* obligation.

Put another way, after the final divorce decree, Bart and Carol each owned a one-half interest in his retirement accounts. In 2011, the trial court entered QDROs to effectuate that division, and Bart does not challenge those orders. The post-divorce orders in 2015, on the other hand, assigned to Carol additional interests in the retirement accounts that had not previously been divided. The post-divorce orders created a new division to enforce Bart's spousal-support obligation. Because Chapter 9 authorizes post-decree QDROs only to effectuate *previous* property divisions, it does not provide authority for the trial court's order at issue. *See In re A.E.R.*, No. 2-05-057-CV, 2006 WL 349695, at *3 (Tex. App.—Fort Worth Feb. 16, 2006, no pet.) (mem. op.) (per curiam) (holding that trial court did not have authority to enter a QDRO that "impose[d] additional obligations on appellant that, by appellee's admission, were not included in the original decree or QDRO"); *Marriage of Jones*, 154 S.W.3d at 227, 229 (holding that QDROs that "provide[d] markedly different and more complex division formulas and address[ed] new and previously unstated conditions and situations" were not "valid orders of the trial court").

In her concurring opinion, JUSTICE LEHRMANN argues that "garnishment of retirement benefits awarded to the payee spouse in order to enforce a child support or spousal maintenance

obligation does nothing to the decree's division of property." *Post* at __. She notes that ERISA defines a "domestic relations order" to include any order that "relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant." 29 U.S.C. § 1056(d)(3)(B)(ii). Because the definition refers to child support and alimony obligations, she concludes that courts may use a QDRO to *further* divide retirement-plan interests to enforce a support obligation by assigning interests that the divorce decree did not assign or divide. Nothing in the federal statutes or the Family Code supports this conclusion. The reference to support obligations recognizes that the court that enters the final decree may divide one spouse's retirement benefits not only as a means to divide the marital property, but also as a means to award child support or alimony.

For example, in *Quijano v. Quijano*, the final divorce decree awarded a "lump sum award of child support" and for "that express purpose," the court awarded the child a specific monetary interest in the father's retirement accounts and, at "the same time as the final decree, the court issued two QDROs to effect the lump sum child support award." 347 S.W.3d 345, 348 (Tex. App. 2011—Houston [14th] 2011, no pet.). The court later entered an amended QDRO, and the father alleged that order

> was void because it modified the division of property set forth in the divorce decree by (1) listing the child as Alternate Payee rather than [the mother], (2) making [the father] liable for the taxes rather than [the mother], and (3) potentially awarding the remainder of the funds to [the mother] in the event the child were to die before distribution of all funds to him.

*Id.* at 353. The court rejected the father's arguments, finding no substantive amendment, but it recognized that as "with any post-divorce enforcement or clarification order, a QDRO may not

22

amend, modify, alter, or change the division of property made or approved in the decree of divorce or annulment." *Id.* at 354 (quoting *Gainous*, 219 S.W.3d at 107).

As *Quijano* illustrates, a divorce decree may divide a spouse's retirement benefits as a means to award child support or alimony, as well as a means to divide the marital property. And when the court does that, it may enter a QDRO to effectuate that division. But it may not later enter a QDRO that amends the division announced in the divorce decree.

The concurrence finds support for its proposition to the contrary in decisions of other states. *See post* at __ (citing *In re Marriage of Thomas*, 789 N.E.2d 821, 831 (Ill. App. Ct. 2003); *Hogle*, 732 N.E.2d at 1284; *Baird v. Baird*, 843 S.W.2d 388, 392 (Mo. Ct. App. 1992)). But each of those cases recognizes the source of that power as state law authorizing assignment of benefits.[19] The courts in those cases did not have to look to law regarding post-decree division of property because

---

[19] *See Marriage of Thomas*, 789 N.E.2d at 831 ("[W]hen a former spouse seeks the assignment of the plan participant's retirement accounts after obtaining a judgment for a maintenance and child support arrearage, the spouse is not a typical creditor as that term is used [in Illinois statute prohibiting assignment of benefits]."); *Hogle*, 732 N.E.2d at 1284 ("Since ERISA does not provide an enforcement mechanism for collecting judgments, state law methods for collecting money generally remain undisturbed by ERISA."); *Baird*, 843 S.W.2d at 392 ("[Missouri statutory law] allows a spouse to attach or execute against any of the debtor spouse's property to enforce a decree for maintenance or child support."). Illinois, Indiana, and Missouri have statutes allowing garnishment of retirement benefits for spousal support arrearages. *See* 750 ILL. COMP. STAT. 5/504 (a) (allowing for "a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct, and the maintenance may be paid from the income or property of the other spouse"), 5/504 (b-7) ("Notwithstanding any other State or local law to the contrary, a lien arises by operation of law against the real and personal property of the obligor for each installment of overdue support owed by the obligor."); IND. CODE § 31-15-7-10 ("Notwithstanding any other law, all orders and awards contained in a dissolution of marriage decree or legal separation decree may be enforced by . . . any other remedies available for the enforcement of a court order . . . ."); MO. STAT. § 452.325(5) ("Terms of the [separation agreement containing provisions for the maintenance of either spouse] set forth in the decree are enforceable by all remedies available for the enforcement of a judgment, and the court may punish any party who willfully violates its decree to the same extent as is provided by law for contempt of the court in any other suit or proceeding cognizable by the court.").

other state law allowed the garnishment of retirement benefits.[20] In contrast, no Texas statute grants the trial court authority to assign Carol more interests in Bart's retirement accounts than was assigned in the final divorce decree.[21]

We must therefore conclude that the trial court acted without statutory authority when it assigned additional interests in Bart's retirement accounts to Carol for Bart's support arrearages. *See Shanks*, 110 S.W.3d at 449 ("The trial court had no authority to enter an order altering or modifying the original disposition of property."); *cf. Hoy v. Hoy*, 510 S.E.2d 253 (Va. Ct. App. 1999) (per curiam) ("Under Virginia domestic relations law, Pearce may not recast her claim as a judgment creditor, albeit one that seeks recovery of unpaid spousal support, into a QDRO which substantively modifies the terms of a final divorce decree. Therefore, under ERISA, the proposed order does not qualify as a QDRO. The cases appellant cites arise from other jurisdictions and have limited persuasive authority in interpreting Virginia statutory law."). The order, having been made without authority, is void. *See Gainous*, 219 S.W.3d at 108 ("Accordingly, we hold that section 9.007 is jurisdictional and that orders violating its restrictions are void.") The court of appeals thus erred by affirming the trial court's QDRO.

---

[20] *See also Kesting v. Kesting*, 370 P.3d 729, 733 (Idaho 2016) ("We conclude that the provisions of Title 11 of the Idaho Code that provide for attachment of exempt property to enforce claims for support are part of Idaho's domestic relations law."); *Stinner v. Stinner*, 554 A.2d 45, 48 (Pa. 1989) ("It was pursuant to this decisional law of the Commonwealth of Pennsylvania that the Stinners, in 1977, entered into the agreement for alimony."). Idaho and Pennsylvania also authorize garnishment of retirement benefits. *See* IDAHO CODE § 11-607 (1)(a) ("A creditor may make a levy against exempt property . . . to enforce a claim for . . . [a]limony, support, or maintenance."); 23 PA. STAT. AND CONS. STAT. § 3703 (authorizing "the taking and seizure of the goods and chattels" for alimony arrearages).

[21] JUSTICE LEHRMANN also sites to a Texas continuing legal education paper and the Texas Practice Series. *Post* at __(citing Charla H. Bradshaw, *Retirement and Employment Benefits*, 2016 TEXASBARCLE Advanced Fam. L. ch. 19, at 37–38 (2016); 33 JOHN F. ELDER, TEXAS PRACTICE: HANDBOOK OF TEXAS FAMILY LAW § 6.3 (2017)). Both sources discuss the general proposition that ERISA allows the use of QDROs to enforce child support and spousal maintenance orders. Neither source, however, explains how *Texas* law allows QDROs for those purposes.

## IV.
## Conclusion

We reverse the court of appeals' judgment upholding the trial court's wage-withholding order and the trial court's qualified domestic relations order. We render judgment that both orders are void.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 29, 2018

25